## WORCESTER COUNTY TRUST CO. et al. v. COMMISSIONER OF INTERNAL REVENUE.

### No. 3812.

Circuit Court of Appeals, First Circuit.

March 29, 1943.

James A. Crotty, Sumner B. Tilton, Jay Clark, Jr., George H. Mason, and Vaughan, Esty, Clark & Crotty, all of Worcester, for petitioners.

Maryhelen Wigle, Sp. Asst. to the Atty. Gen., and Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key and A. F. Prescott, Sp. Assts. to the Atty. Gen., and J. P. Wenchel, Chief Counsel, Bureau of Internal Revenue, and Ralph F. Staubly, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., for Commissioner of Internal Revenue.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

WOODBURY, Circuit Judge.

This is a petition by the executors of the estate of James Smith for review of that part of a decision of the United States Board of Tax Appeals, now the Tax Court of the United States, which sustained the Commissioner's determination of the value for estate tax purposes of certain shares of stock which it is admitted were properly included in their decedent's gross estate.

From the record on review and the opinion of the Board it appears that James Smith died on June 9, 1937, and that his executors elected to value his gross estate as of one year after the date of death. In his gross estate were 12,760 shares of no par value capital stock of the Southwell Wool Combing Company, a Massachusetts corporation. It appears that this Company was organized in 1922 by members of a few families and that since that time it has engaged in the business of scouring and combing wool by a technical process requiring machinery and equipment which small textile mills do not have, but which large ones do. Its business, therefore, is done entirely with small mills; about 95% thereof being with four customers. The Company has but one salaried official, who is an experienced and capable manager, but who is now getting along in years.

On July 25, 1935, in order to keep the Company's stock in the founding families, the stockholders voted to amend the articles of incorporation by inserting therein restrictions upon the sale and transfer of its shares. These restrictions, which are endorsed on each certificate of stock, read as follows:

"Any holder of shares of the common capital stock of the corporation, the executor or administrator of any deceased holder of any such shares, the trustee in bankruptcy or assignee in insolvency of any such shares, the assignee of any such shares sold on execution, desirous of transferring the same either for value or by way of gift or otherwise, shall first offer said shares in writing to the directors of the corporation, who may buy them for the use of the corporation at their book value as appears from the books and records of the corporation as of the date of the close of the last prior month of the corporation plus interest from that date at the rate of six (6%) per cent per annum, less any dividends which may have been declared thereon since such date and which shall have been paid or are payable to the seller.

"The directors shall have the right to purchase such shares within a period of thirty (30) days from the receipt of such offer but shall not be required to do so and if the directors do not so purchase within such period, such stockholder shall be at liberty to sell and dispose of the said shares at any price whatsoever.

"The above restriction shall not apply to any transfer by the executor or administrator of a deceased stockholder to legatees or next of kin of such deceased stockholder in the distribution of his estate, whether under the terms of his will or under the provisions of interstate (sic) law.

"The board of directors may from time to time by vote in specific instances waive compliance by a seller with the foregoing provisions."

The Company's shares have never been listed on any exchange and since the date of the amendment no shares have either been offered to the Company for sale or have been sold. From a stipulation of facts filed at the hearing before the Board of Tax Appeals it appears that the book value of the stock as of the close of the last month prior to the date selected by the executors for the valuation of their decedent's estate, plus interest and less dividends, was $15.46 per share. This was the figure used by the executors in their estate tax return, but the Commissioner's determination of value, based, as he said, upon the Company's "income, balance sheets, and other relevant factors" was $35 per share and he assessed a deficiency accordingly. In the stipulation referred to above the parties agreed that the Commissioner's figure is exactly ten times the average net earnings of the Company over the five year period from 1933 to 1937, inclusive.

On the basis of the foregoing facts the Board sustained the Commissioner's determination of value although it admitted in its opinion that it was "in no position to 'find that the value should be computed on the basis of average net income', for the question of fair market value is ever one of fact and not of formula. Net earnings are important but they are only one of the many factors upon which value of shares may be considered, and the significance to be given to such figures depends upon the evidence of all the circumstances in which

they are found. Without knowledge of the setting in which the earnings appear, they lack substantial evidentiary forces from which a useful inference of fair market value can be drawn. Furthermore, it would be entirely unwarranted for the Board, without evidence supporting it, to select a multiple of average earnings as the basis for a finding of fair market value." But the Board went on to conclude the part of its decision which the petitioners ask us to review with the statement: "The evidence does not contain data upon which a finding can be made that the fair market value of the shares was less than the $35 a share which the Commissioner has determined. That value must be adopted, not because of the stipulated formula of ten times average earnings, but because there is no adequate evidence proving it to be incorrect or another figure to be correct."

The petitioners contend that the Board erred in ruling as a matter of law that the Commissioner's determination of value must be sustained because there was no adequate evidence to prove his valuation incorrect or another valuation correct; that the Board's decision was based upon an erroneous conclusion of law, that is, the conclusion that the restriction on the sale of the stock imposed by the amendment of July 25, 1935, did not affect its value; and that the Board in its decision erroneously disregarded evidence. The Commissioner, on the other hand, argues that the Board should be sustained because his valuation, which the Board upheld, was presumptively correct, and the petitioners have failed to sustain their burden of proof which, he says, is not only to show that his valuation was wrong but also to show affirmatively that some other valuation is correct.

■ The Commissioner is mistaken as to the extent of the burden of proof which rests upon taxpayers in proceedings of this sort. In actions brought in district courts of the United States to recover taxes which have already been paid the taxpayer has the burden "specifically to show not merely that the assessment was erroneous but also the amount to which he was entitled" (Helvering v. Taylor, 293 U.S. 507, 514, 55 S.Ct. 287, 290, 79 L.Ed. 623; see also Forbes v. Hassett, 1 Cir., 124 F.2d 925), but in petitions such as this, that is petitions brought in the Board of Tax Appeals for redetermination of a de-

ficiency set forth by the Commissioner, the burden on the taxpayer is not as onerous. The extent of a taxpayer's burden in proceedings of this latter sort was stated by the Supreme Court in Helvering v. Taylor, supra, as follows:

"We find nothing in the statutes, the rules of the Board or our decisions that gives any support to the idea that the Commissioner's determination, shown to be without rational foundation and excessive will be enforced unless the taxpayer proves he owes nothing or, if liable at all, shows the correct amount. While decisions of the lower courts may not be harmonious, our attention has not been called to any that persuasively supports the rule for which the Commissioner here contends.

"Unquestionably the burden of proof is on the taxpayer to show that the Commissioner's determination is invalid. Lucas v. [Kansas City] Structural Steel Co., 281 U.S. 264, 271, 50 S.Ct. 263, 74 L.Ed. 848; Wickwire v. Reinecke, 275 U.S. 101, 105, 48 S.Ct. 43, 72 L.Ed. 184; Welch v. Helvering, 290 U.S. 111, 115, 54 S.Ct. 8, 78 L.Ed. 212. Frequently, if not quite generally, evidence adequate to overthrow the Commissioner's finding is also sufficient to show the correct amount, if any, that is due. See, e. g., Darcy v. Commissioner [2 Cir.], 66 F.2d 581, 585. But, where as in this case the taxpayer's evidence shows the Commissioner's determination to be arbitrary and excessive, it may not reasonably be held that he is bound to pay a tax that confessedly he does not owe, unless his evidence was sufficient also to establish the correct amount that lawfully might be charged against him."

It is not clear to us from the Board's opinion, the pertinent parts of which we have quoted above, whether or not it fell into the Commissioner's error with respect to the extent of the taxpayer's burden of proof. We are not sure whether it sustained the Commissioner's determination of value because in its opinion the taxpayers had failed to introduce evidence sufficient to persuade it that his determination was incorrect, or whether it found the Commissioner's determination incorrect but nevertheless sustained him because it thought that the taxpayers had not gone further and introduced evidence sufficient to show that some valuation other than his was correct. This is not vital, however, because we find in the rec-

ord evidence which persuades us that the Board's determination of value was "arbitrary and excessive" or "without rational foundation and excessive" (to quote the Supreme Court's actual words), and under the rule of the Taylor case, this requires that we should reverse the Board and remand the case to it for further action on the question of the value of the stock regardless of whether or not the taxpayers' "evidence was sufficient also to establish the correct amount that lawfully might be charged against him".

Turning to the Board's opinion it seems to us clear that in spite of what it said with respect to the impropriety of using a multiple of average earnings as the basis for a finding of fair market value, without knowledge of the setting in which the earnings appear, that in fact is exactly what the Board did. There being no evidence anywhere in the record to indicate that the stock was worth $35 per share, except that $35 per share is the valuation arrived at by multiplying the average earnings of the Company over the five year period from 1933 to 1937 by ten, we must conclude that the Board followed the Commissioner in doing just that. There is no other rational explanation for its result.

In view of the facts found by the Board and stipulated by the parties we believe that this valuation is arbitrary and excessive.

Under the applicable statute and regulations,[1] the problem is to determine the fair market value as of the applicable valuation date. There having been no actual sales or bid and asked prices to evidence that value, the regulations direct that inquiry be made as to the price at which the stock would have changed hands on the applicable date, not as a block but per unit, "between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell." And to arrive at this figure the regulations require that consideration be given to the Company's net worth, earning power, dividend-paying capacity, and all other relevant factors bearing upon the value of the stock.

We shall first consider the bearing of the amendment of July 25, 1935, on the question of the value of the stock.

The taxpayers contend that the effect of this amendment is to fix the market value of the stock at its book value. The Board, however, took the position that it had no effect whatever on market value. With

---

[1] "Revenue Act of 1926, c. 27, 44 Stat. 70, as amended:

"Sec. 302. The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, real or personal, tangible or intangible, wherever situated—

"(a) To the extent of the interest therein of the decedent at the time of his death." 26 U.S.C.A. Int.Rev.Acts, page 227.

"Treasury Regulations 80 (1937 ed.):

"Art. 10. *Valuation of property.*—(a) General.—The value of every item of property includible in the gross estate is the fair market value thereof at the time of the decedent's death; or, if the executor elects in accordance with the provisions of article 11, it is the fair market value thereof at the date therein prescribed or such value adjusted as therein set forth. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. The fair market value of a particular kind of property includible in the gross estate is not to be determined by a forced sale price or by an estimate of what a whole block or aggregate would fetch if placed upon the market at one and the same time. Such value is to be determined by ascertaining as a basis, the fair market value as of the applicable valuation date of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. All relevant facts and elements of value as of the applicable valuation date should be considered in every case. Depreciation or appreciation in value subsequent to the valuation date are not relevant factors and will not be considered.

\* \* \* \* \*

"(c) *Stocks and bonds.*—The value of stocks and bonds, within the meaning of the statute, is the fair market value per share or bond on the applicable valuation date.

\* \* \* \* \*

"If the value of a security can not be determined by sales, or from bid and asked prices, as prescribed in the preceding provisions, then, \* \* \* the value is to be arrived at \* \* \* in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock."

respect to it the Board said: "Only if a shareholder chose to sell was he required to make an offer to the corporation at book value of the time. The corporation had no absolute right to demand sale—it had no 'call'—which fixed the price at which the shareholder could be required to sell. If the corporation wanted his shares before the shareholder wanted to sell at book value, it could dicker with him for a price and book value would not be a determinant of the price. He and the corporation would be the ordinary willing seller and buyer, and fair market value would be the price upon which they would agree, with a presumed knowledge of the facts. The restriction leaves the value unaffected and only restricts the field of available purchasers in the first instance, if the shareholder should wish to sell. It cannot be said that such a restriction necessarily affects the fair market value."

We cannot agree with the taxpayers that the amendment set the value of the shares at their book value on the critical date. The amendment did not prohibit sales of the stock except at book value, nor did it fix book value as a call price at which at the behest of the corporation the stock must be sold. It fixed a limitation on the price obtainable by a shareholder for his shares only if he wished to sell and if the corporation at that time wished to buy. The Board's comments quoted above dispose of the taxpayers' contention. But we do not believe that the Board was correct in saying that the "restriction leaves the value unaffected" for the reason that it "only restricts the field of available purchase in the first instance". In our view it must be said that the restriction necessarily has a depressing effect upon the value of the stock in the market.

A commodity freely salable is obviously worth more on the market than a precisely similar commodity which cannot be freely sold. To be sure the restriction does not affect the value of the stock so long as the owner does not wish to sell, but it is not this value which, under the regulations, is to be used as the basis for computing the tax. The value to be used for this purpose is "the fair market value", at the critical date, that is the "price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell." While it may be true that the stock of the Company was so held that decedent's son could, and maybe would, force a vote of the directors waiving compliance with the restrictions in the event that the petitioners wished to sell, still the fact remains that the stock in a buyer's hands would be subject to the restriction and there is nothing to indicate that in his hands the directors would be disposed, or could be forced, to waive for his benefit. Upon purchase, then, a buyer would own a stock which if he ever elected to sell, he might well have to sell at book value, and this undoubtedly would tend to reduce its value on the market. It seems to us that in reason it must be said that the restriction affected the market value of the stock, and this being so it should have been considered as one of the "relevant factors having a bearing" on that question.

We think the Board was also in error in failing to consider the Company's prospects for the future as a factor having a bearing on the value of its stock. That is to say, the Board, without explanation, made no mention of certain testimony offered by the taxpayers on this subject and it disregarded its own findings to the effect that the sole salaried officer in charge of the Company, although capable, was "getting along in years", and that the great bulk of the Company's business was done with only four customers, all of them small mills. When there have been no recent sales of a stock to evidence its fair market value, that value undoubtedly depends in large measure upon the Company's past record of earnings, its past capacity to pay dividends and the present net worth of its assets. But its future prospects also have a distinct bearing on the value of its shares. Other things being equal, it cannot be doubted that shares in a company with a brilliant future are worth more than shares in one with either dark or dubious prospects. In cases of this sort, where there have been no sales or bid and asked prices, these factors are relevant and should have been considered, not disregarded.

The decision of the Board of Tax Appeals is reversed and the case is remanded to the Board for further proceedings in conformity with this opinion.

MAGRUDER, Circuit Judge, heard the argument but through absence was unable to participate in the decision of this case.