## SPITZER v. COMMISSIONER OF INTERNAL REVENUE.
### No. 13168.

Circuit Court of Appeals, Eighth Circuit.

March 6, 1946.

David Baron, of St. Louis, Mo., for petitioner.

Harold C. Wilkenfeld, Sp. Asst. to Atty. Gen. (Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Robert N. Anderson, and Leonard Sarner, Sp. Assts. to Atty. Gen., on the brief), for respondent.

Before SANBORN, THOMAS, and RIDDICK, Circuit Judges.

RIDDICK, Circuit Judge.

On October 15, 1940, petitioner gave to his wife 75 shares of common stock of the Forest City Manufacturing Company. In his gift tax return for the calendar year 1940 petitioner reported the stock at a value of $186 a share. Petitioner intended the value of the stock to be reported at $286 a share, the book value as of December 31, 1939.' He admits liability for whatever difference in tax results because of this error, caused by a mistake made in calculation by the accountant who prepared the gift tax return. The Commissioner fixed the value of the stock at $500 a share and assessed a deficiency. The Tax Court approved the Commissioner's determination. We are asked to reverse on the ground that the finding of the Tax Court as to the value of the stock has no support in the evidence and no reasonable basis in law.

The Forest City Manufacturing Company, a Missouri corporation with principal offices in St. Louis, was organized prior to 1918. In 1919 all of it capital stock was purchased by petitioner Harry H. Spitzer who became president, Simon Spitzer who became vice president, and A. H. Sincoff who became secretary. These men are still executive officers of the company and together with their respective families own substantially all of its capital stock. The company has a capitalization of $300,-

000, represented by 1,000 shares of common stock of a par value of $100 and 2,000 shares of seven per cent preferred stock of a par value of $100 a share. Prior to 1939 the company was engaged in the manufacture of cotton house dresses and became one of the largest manufacturers engaged in this business in the United States. Since 1939 it has engaged exclusively in the manufacture of junior misses dresses.

The business in which the company is engaged is subject to wide fluctuation and is extremely hazardous. A mistake in the style design of its line of dresses for one season might be sufficient to wreck its business, 'and the effects of such a mistake may be seriously felt for years in the business of the most successful company. No stocks of companies engaged in the same business as that of the Forest City Manufacturing Company are listed for trading purposes with any stock exchange or traded locally in over-the-counter sales. There is no evidence of sales of stock in the Forest City Manufacturing Company. From the going quotations of other securities in similar but not so hazardous types of business in St. Louis and in other parts of the country in 1940 in both over-the-counter and on the market transactions, it was most usual to find them selling at five or six times their average earnings over a five-year period. The price in some sales was as high as eight times average earnings for the period stated. The listed markets for securities in 1940 were uncertain and unsettled as the result of the war in Europe. These markets suffered a collapse in May 1940 and, although they recovered somewhat in the summer of that year, they faced a difficult situation throughout the year.

From 1930 through 1940 invested capital of the company increased from $200,000 to $300,000; its net profit after taxes from $16,000 to $128,000; its net sales from approximately $2,000,000 to approximately $4,500,000; and earnings available for dividends on common stock from $9,000 to $114,000. The average earnings for the company available for dividends on common stock for the five years ending December 31, 1940, were $68 a share, and the average dividend paid on the common stock during this period was $47 a share. There was no evidence offered to indicate the comparative record of companies engaged in similar business over the five-year period. The trend in the company's earnings available for dividends on the common stock had been steadily upwards since 1936. For the four years ending in 1940 these earnings had averaged approximately $82 a share. After the company changed from the manufacture of women's cotton house dresses to junior misses dresses in 1939, its average earnings for that year and for 1940 available for common stock were approximately $103 a share. Dividends paid in 1939 were $90; in 1940, $75. As noted above, the book value of the common stock as of December 31, 1939, was $286. The 1940 balance sheet of the company indicates that at the time of the gift on the 15th day of October 1940, and prior to the declaration of an annual dividend of $75 a share on the common stock, the book value of the common stock was approximately $400 a share after allowing for the payment of dividends on the preferred stock for the entire year. The book value of common stock as shown by the company's balance sheets is apparently conservative, certainly not excessive.

It would appear from what has been said that the Tax Court's finding of the market value of the common stock at the time of the gift was supported by ample evidence. But petitioner asserts that the market value of the stock at the time of the gift was fixed by an agreement between the company and all of its stockholders, executed in May 1940; and that in any event the Tax Court refused to give any weight to the agreement as a factor important in the determination of the market value of the stock at the time of the gift, and has ignored the testimony of a qualified expert witness for the petitioner who testified that at the time of the gift the fair market value of the common stock of the company was not in excess of two-thirds of its book value on December 31, 1939.

At the time of the execution of the contract relied upon by petitioner, each of the three executive stockholders held 310 10/12 shares of the 1000 shares of the common stock of the company. The purpose of the contract was to insure the continued control of the corporation by these executive stockholders or by the survivors of them. The voting power of all the common stock of the corporation was vested by the contract in the three executive stockholders or the survivors of them. The right of the holders of any of the common or preferred stock of the corpora-

tion, other than the executive stockholders, to pledge or encumber their shares was prohibited without the consent of the executive stockholders. The corporation, the executive stockholders, or the survivors of them were given the right to purchase the company's outstanding capital stock at prices fixed by the provisions of the contract and upon certain contingencies expressed in the contract.

On the death of one of the executive stockholders, the corporation was required to purchase from the then holders or their personal representatives all the stock, common or preferred, owned by the executive stockholder at the time of the execution of the contract, or to liquidate, as the surviving executive stockholders might elect. In the event that the surviving executive stockholders decided to purchase from the then holders the stock held by the deceased executive stockholder at the date of the contract, the purchase was to be consummated within three months after his death. The purchase price of the common stock was fixed at its book value as determined by the regular audit of the books of the corporation as of the close of the last preceding fiscal year if the death of the executive stockholder occurred within the first ten months of the fiscal year, or at the book value at the close of the then current fiscal year if the death occurred during the last two months of the fiscal year. The fiscal year of the corporation was the same as the calendar year. If the book value as of the close of the last fiscal year preceding the death of the executive stockholder became the purchase price of the stock, provision was made for adjustment in the purchase price by giving consideration to any substantial changes in capital account which might have taken place in the interim between the close of the preceding fiscal year and the date of the consummation of the purchase, including the maturity of insurance carried upon the life of the deceased executive stockholder, and to certain other accounting factors not important here. At the time of the gift in question the corporation carried insurance upon the life of petitioner in the amount of $100,000. The purchase price of the common stock was to be paid in cash to the extent of the proceeds of the insurance upon the life of the deceased executive stockholder, the balance to be represented by unsecured notes of the corporation, payable over a period of three years, bearing interest at six per cent, and subject to prepayment and to acceleration on default.

In the event the corporation was unable to purchase the stock of a deceased executive stockholder, the contract provided that the purchase should be made by the corporation to the extent that such purchase was lawful, and that the surviving executive stockholders should purchase the remainder of the stock upon the same terms as were provided for purchase by the corporation.

On the death of the second executive stockholder, the corporation was required to purchase upon the same terms as set forth above from the then holders or their personal representatives all stock in the corporation owned by the deceased second executive stockholder or by his wife or lineal descendants at the time of the execution of the contract.

After first obtaining the approval of all the executive stockholders or the survivors of them, the corporation or any of the executive stockholders had the right to purchase any or all of the common or preferred stock held by any stockholder at any time upon notice of such intention to the holder of the stock. In the event of a purchase under this section of the contract, the stockholder was required to deliver his stock to the purchaser for a cash payment equal to the book value of the stock at the close of the fiscal year preceding the purchase. As of the close of the fiscal year in which a purchase under this section took place, the purchase price was fixed at the book value of the stock on such date, as shown by the audit of the books of the corporation, plus dividends payable or paid on common stock to holders of record after the date of the purchase and before the end of the fiscal year in which the purchase was made.

The contract also contained a provision that if any executive stockholder ceased to be an active officer of the company without the approval of the other executive stockholder or stockholders, the corporation or any of the executive stockholders or any combination of them should have the right to purchase all the common stock held by the inactive executive stockholder or by his wife or by his descendants or by any trust or estate for the benefit of any of them. The price to be paid for the stock under this section of the contract was to

be determined in accordance with the provisions of the section stated above, and the right to make the purchase vested at any time after an executive stockholder became inactive.

The contract expired by its terms after the death of two executive stockholders and after obligations under the contract arising in connection with their deaths had been fulfilled. Otherwise, the contract was to continue in effect until terminated by the agreement of all the executive stockholders or the survivors of them or by the written irrevocable request of any one of the executive stockholders delivered to the others and to the corporation two years prior to the effective date of such termination.

Specifically the petitioner contends that, since the gift to his wife was made in the first ten months of 1940, the agreement executed by the stockholders was effective to fix the market value at the book value of the shares, which were the subject of the gift, as of December 31, 1939, or at $286 a share. Giving this effect to the contract, petitioner contends that the Tax Court's decision upon the question of value of the stock was not in accordance with law.

We think it clear that the Tax Court was correct in its decision that the contract did not fix the value of the stock for gift tax purposes as the taxpayer contends. The cases relied on by petitioner have no application to the facts in the present case.

Helvering v. Salvage, 297 U.S. 106, 56 S.Ct. 375, 80 L.Ed. 511, affirming Salvage v. Commissioner, 2 Cir., 76 F.2d 112, was an income tax case which involved the determination of the fair market value of capital shares of a corporation. At the critical date the stock was subject to an option entitling the holder of the option to purchase the stock at a stated figure. It was held that in view of the option there could be no proper finding of fair market value on the critical date in excess of the option price. Wilson v. Bowers, 2 Cir., 57 F.2d 682, and Lomb v. Sugden, 2 Cir., 82 F.2d 166, involve the value of shares of corporate stock for estate tax purposes. In the Wilson case decedent's shares of stock in a closely held corporation were subject at his death to a contract between him and the other owners of the capital stock of the corporation, by the terms of which on the death of one of them either of

the others had the right to purchase the decedent's shares at a stated price at any time within four months after the qualification of the decedent's executors. It was held that the contract fixed the value of the capital stock for estate tax purposes in the amount stated in the contract. In Lomb v. Sugden, decedent at her death held the shares of stock subject to an agreement whereby none of the stockholders of the corporation could sell his stock without first offering the shares to the other stockholders at a limited price, and whereby, in the event of a stockholder's death intestate and without issue, his executors or administrators were required to offer the stock at the limited price to the other stockholders. The court held that the value of the stock for the purpose of determining the Federal estate tax was the price fixed by the terms of the agreement. Commissioner v. Bensel, 3 Cir., 100 F.2d 639, and Commissioner v. Childs' Estate, 3 Cir., 147 F.2d 368, also involve the determination of value of shares of corporate stock for estate tax purposes. In the Bensel case the stock was subject on the date of the death of the holder to an absolute option for its purchase at less than its market value. It was held that the price fixed in the option to purchase, not the fair market value of the stock, should be included in the estate for the determination of the estate tax. In Childs' Estate the court declined to reverse the Tax Court's decision that the value of shares for estate tax purposes was $10 a share as fixed by an option for its purchase in effect at decedent's death, and not $100 a share, its market value. The contention of the Commissioner before the Tax Court was that, since the option had not been exercised at the time of decedent's death, its provisions were not entitled to be considered as a factor in determining the fair market value of the stock. The court denied this contention and refused to consider other arguments not advanced by the Commissioner before the Tax Court.

Plainly, all these cases are distinguishable from the facts in the present case. In the income tax case the value of the shares and the critical time for the determination of value were fixed by the option contract. In each of the estate tax cases the critical event, the death of the holder of the shares, which subjected the stock to purchase for a price stated in the

option, had occurred. In the circumstances of these cases it was plain that a purchaser could not be found for the shares at a greater price than that for which he would be compelled to sell immediately upon acquisition. In the present case petitioner at the time of the gift was 51 years of age, with a life expectancy of twenty years. When the gift was made no one could predict when petitioner might die, or retire without the consent of the other executive stockholders. The critical event necessary to occur in order to bring into play the provisions of the contract fixing the price of the stock given by petitioner to his wife had not occurred; and, by its terms, the contract might have been terminated long before the occurrence of the critical event. The point under discussion was clearly illustrated in Commissioner v. McCann, 2 Cir., 146 F.2d 385, decided by the same court which decided Wilson v. Bowers, and Lomb v. Sugden. The controversy was over the value of corporate shares for gift tax purposes. The taxpayer gave 2500 shares of stock to his wife on November 27, 1939. The book value of these shares as of December 31, 1939, was $36 a share. The taxpayer adopted this figure in reporting the gift. The Commissioner raised the value and assessed a deficiency. Under the company's by-laws no one but an employee might hold these shares. When his employment ended, the employee or his estate was required to sell and the corporation was required to buy all the shares at their book value. The taxpayer was the president of the company, holding more than two-thirds of the voting stock. His wife was an employee. The Tax Court refused to consider any other factor than the book value at the time of the gift because that was all that the donor could have sold the shares for and because he could have compelled the company to buy them at that price. The court of appeals reversed. After holding the Wilson and Lomb cases inapplicable to the facts before it, the court said (page 386 of 146 F.2d):

" * * * Nobody could know when the donor would retire or die; meanwhile he would be entitled to such dividends as were declared; and when he did retire or die, the book value of the shares would not be likely to bear much relation to what it was at the time of the gift. It is difficult enough to appraise the value of shares subject to such a restriction, but it is no step towards a solution to make the book value at the time of the gift the measure. * * * The fact that the price at the shareholder's retirement or death was fixed for both parties, did not prevent the shareholder from collecting any dividends declared before that time, nor did it change the fact that the book value at the time of the gift would presumably have no relation to that which would eventually fix the price. * * *"

In support of its conclusion in the McCann case the court cited Kline v. Commissioner, 3 Cir., 130 F.2d 742, and Krauss v. United States, 5 Cir., 140 F.2d 510. In both of these cases a corporation had an option based upon book value to purchase a shareholder's stock if he died or retired. In each case the controversy was over a gift tax, and in each case the court held that the option price did not control the value of the shares for the determination of gift tax. See also Heiner v. Gwinner, 3 Cir., 114 F.2d 723.

We conclude that the most that can be said concerning the effect of the contract upon the fair market value of the stock at the time of the gift is that it was a factor to be considered by the Tax Court in appraising the stock for gift tax purposes. Worcester County Trust Co. v. Commissioner, 1 Cir., 134 F.2d 578. Plainly, the contract was not effective to fix the value at the time of the gift at the book value of the stock as of December 31, 1939. To give to the so-called restrictive agreement the effect for which the petitioner contends requires that a provision be read into the contract which it does not contain. Petitioner made his gift in October 1940. If petitioner had died on the date of the gift, the provision fixing the price at which the corporation was required to buy the stock would have gone into operation. But the corporation was not required to purchase the stock in the event petitioner made a gift of it. At the time of the gift the corporation had that right only with petitioner's consent which was not given. It is no more possible to say when, if ever, this consent might be forthcoming, than it is to say when the petitioner might die or retire. But, if we indulge the assumption that the consent of petitioner to purchase from the donee was a reasonable probability, in view of the intrinsic value of the stock at the time of the gift, the price fixed by the contract for the purchase would not

972

have been the book value as of December 31, 1939, but the book value as of December 31, 1940, or later, depending upon when petitioner's consent was forthcoming. And it may be noted that, if the death or retirement of the petitioner had occurred in the month following the gift, the purchase price fixed by the contract would also have been the book value as of December 31, 1940, which the Tax Court found to be approximately $400 a share; and, if petitioner's death had occurred in that month, this book value would have been greatly increased through the receipt by the corporation of the insurance upon petitioner's life.

We think it must be said that the contract relied on by petitioner tended to depress the fair market value of the stock at the time of the gift by limiting the class of prospective purchasers, by depriving holders of voting power and of the right to pledge the stock, and by subjecting them to the risks of the death or retirement of the holder from whom the stock was purchased, and to the chance of his consent to repurchase by the corporation at a value which conceivably might be less than the intrinsic value of the stock. Worcester County Trust Co. v. Commissioner, supra, at pages 581, 582 of 134 F.2d 578. But the Tax Court did not hold otherwise. On the contrary, it gave consideration to the contract and to its probable effect upon the fair market value of the stock for gift tax purposes when weighed against other relevant factors shown by the evidence. The Tax Court concluded its discussion of this feature of the case by saying:

"Under all the circumstances, we are not persuaded that any price at which the stock would change hands between petitioner as a willing seller and any willing buyer in a position to offer full value for the property would be so far below intrinsic value as to result in a figure less than the amount determined by respondent."

 There are expressions in the opinion of the Tax Court which, lifted from their context, tend somewhat to support petitioner's argument, but a fair consideration of the court's opinion shows that in appraising the value of the stock it gave to the provisions of the restrictive contract the weight to which it thought them entitled in the light of all the evidence in the record. We can not say there is no warrant in the record for the Tax

Court's conclusion. Commissioner v. McCann, supra. The question of value is a question of fact on which the Tax Court's finding supported by evidence may not be disturbed by the courts. Boehm v. Commissioner, 66 S.Ct. 120, 124; Dobson v. Commissioner, 320 U.S. 489, 64 S.Ct. 239, 88 L.Ed. 248; Ushco Mfg. Co. v. Commissioner, 2 Cir., 151 F.2d 821, 822; Helvering v. Kendrick Coal & Dock Co., 8 Cir., 72 F.2d 330; Williams v. Commissioner, 8 Cir., 44 F.2d 467.

 What has just been said applies to the argument that the Tax Court was required to accept the estimate of petitioner's expert witness as to the value of the stock. The weight of this testimony was for the Tax Court. Where, as here, there was other evidence before the court upon which it might reasonably make its own determination of value, it committed no error in rejecting the expert's opinion. National Weeklies, Inc., v. Commissioner, 8 Cir., 137 F.2d 39, 42; Kline v. Commissioner, supra; Whitlow v. Commissioner, 8 Cir., 82 F.2d 569, 572; Gloyd v. Commissioner, 8 Cir., 63 F.2d 649, 650.

The decision of the Tax Court is affirmed.