ESTATE OF LUCRETIA EDDY COTCHETT, Deceased, CAROLYN NEGRIER, Executor, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of Cotchett v. Commissioner
Docket No. 7603-71.
United States Tax Court
T.C. Memo 1974-31; 1974 Tax Ct. Memo LEXIS 285; 33 T.C.M. (CCH) 138; T.C.M. (RIA) 74031; February 4, 1974, Filed. Thomas B. Fenlon, John E. Bennett, and Carlton R. Asher, Jr., for the petitioner.
Marion L. Westen, for the respondent. TANNENWALD
MEMORANDUM FINDINGS OF FACT AND OPINION
TANNENWALD, Judge: Respondent determined a deficiency of $118,098.07 in petitioner's Federal estate tax. Petitioner claims an overpayment of such tax in the amount of $92,255.08. The only issue for decision is the valuation of certain stock of a family investment *286 company which the decedent owned at the time of her death. 2 FINDINGS OF FACT
Some of the facts have been stipulated and are found accordingly. The stipulations of facts and attached exhibits are incorporated herein by this reference.
Lucretia Eddy Cotchett (hereinafter referred to as the decedent), a citizen of the United States and resident of Paris, France, died on April 26, 1967. She was survived by a daughter, Carolyn Negrier, who was appointed executrix of the decedent's estate. The executrix filed a Federal estate tax return with the Director of International Operations, Internal Revenue Service, Washington, D.C. At the time she filed the petition in this case, the executrix was a citizen of the United States and a resident of Paris, France.
At the time of her death, the decedent owned 20,962 shares of stock of Eddy Investment Company (hereinafter EICO), or 20.2 percent of the corporation's 103,621 total shares outstanding. These shares were reported on the estate tax return at a value of $65.83 per share and determined by respondent in his notice of deficiency to have a value of $80.00 per share. In its amended petition, petitioner 3 alleges that the fair *287 market value of such shares on the date of decedent's death was $49.87 per share.
EICO was incorporated in the State of Maine in 1907 and reincorporated under the same name in the State of Washington on January 3, 1962. At all times, the only shareholders of EICO have been the decedent and other descendants of her father or trustees for the benefit of their spouses or issue.
On March 1, 1962, the shareholders of EICO adopted a bylaw restricting the transferability of the corporation's stock. Thereafter, each certificate for the shares of EICO, including those owned by the decedent, bore a legend referring to the restraints on transfer provided in such bylaw. The bylaw provided that no shares of the corporation could be sold or otherwise transferred (except by gift, bequest, or inheritance, as described below) to anyone other than a present shareholder of the corporation, a descendant of decedent's father, or a trustee for the benefit of a shareholder's spouse or issue unless the shares were first offered at the same price to the corporation and its shareholders. If the corporation or its shareholders within 90 days failed to accept such offer and to tender the purchase price for *288 all the 4 shares offered, the offering shareholder was then free to sell the shares to the same person and at the same price as stated in his offer of sale, but not otherwise. The bylaw further provided that no shares of the corporation could be transferred by gift, bequest, or inheritance to persons other than present shareholders of the corporation, descendants of decedent's father, or trustees for the benefit of a shareholder's spouse or issue.
Between April 1954 and June 1961, there were no transfers of EICO stock. From June 1961 through the date of decedent's death, there were no transfers of EICO stock (except the redemptions noted below) other than by gift, bequest, or inheritance, including gifts of such stock made by the decedent to her daughter.
On July 30, 1965, EICO redeemed 6,379 shares of its stock from the estate of one of decedent's brothers. On July 16, 1968, EICO redeemed an additional 2,317 shares of its stock from that same estate and also redeemed 6,923 shares of its stock from decedent's estate. On June 1, 1971, EICO redeemed an additional 1,347 shares of its stock from decedent's estate. Each such redemption was made in accordance with the provisions *289 of section 303, Internal Revenue 5 Code of 1954, to enable the respective estates to pay death taxes due. Each such redemption was made by distributing to the respective estates, in exchange for each share of EICO stock redeemed, marketable securities from the corporation's investment portfolio equal in value to 66 percent of the underlying net asset value per share of EICO stock [1] as of the date the corporation agreed to the redemption.
The condensed balance sheet of EICO as of the date of decedent's death (April 26, 1967) and its earnings statements for the years closest to such date (1966 and 1967) are as follows: BALANCE SHEET
Cost
Market ASSETS
Cash and commercial paper
Demand deposits - U.S.
$ 88,400
$ 88,400
Savings deposits - Canadian
44,100
43,200
Time certificates of deposit
280,000
280,000
$ 412,500
$ 411,600
Marketable securities
U.S. Treasury Notes and Bonds
$ 255,400
$ 258,200
Municipal bonds
1,013,500
1,076,100
U.S. corporate stocks
2,951,600
7,223,300
Canadian corporate stocks
246,900
954,500
$4,467,400
$ 9,512,100
Other assets
Notes receivable
$ 425,000
425,000
Other miscellaneous
5,900
5,900
$ 430,900
$ 430,900
Total Assets
$5,310,800
$10,354,600
Liabilities and STOCKHOLDERS EQUITY
Liabilities
Federal income tax
$ 19,100
$ 19,100
Other miscellaneous
600
600
$ 19,700
$ 19,700
Stockholders equity
Common stock
$ 120,000
Contributed capital
1,680,000
Capital surplus
400
$10,334,900
Retained earnings
3,886,500
Less: Treasury stock
(395,800)
$5,291,100
$10,334,900
Total Liabilities and Stockholders Equity
$5,310,800 $10,354,600
EARNINGS STATEMENTS
1967
1966
Income
Dividends
$ 280,700
$ 270,100
Bond interest
50,600
56,600
Other income
34,500
17,600
Gross operating income
$ 365,800
$ 344,300
Expense
Salaries and consultants fees
$ 40,800
$ 49,200
Other expenses
16,500
17,400
Gross operating expense
$ 57,300
$ 66,600
Net income from operations before income tax
$ 308,500
$ 277,700
Income tax on operations
23,000
13,900
Net income from operations
$ 285,500
$ 263,800
Earnings per share
$2.75
$2.55
Dividends paid per share
$2.50
$2.20
Earnings retained in the business January 1
$3,794,800
$4,120,200
Add: Net income from operations
$ 285,500
$ 263,800
Deduct: Dividends paid
(259,100)
(228,000)
$ 26,400
$ 35,8000
Add: Capital gains on disposal of assets (Net)
$ 57,100
9,200
$ 83,500
$ 45,000
Addition to stockholders equity
$3,878,300
$4,165,200
Less: Surplus adjustments
(2,100)
(370,400)
Earnings retained in the business December 31
$3,876,200
$3,794,800
*290 7 The following table sets forth pertinent data relating to EICO for the periods indicated: Year
Net asset value per share as at Dec. 31
After tax net income per share
Dividends per share outstanding 1967
$99.74 (as at 4/26)
$2.76
$ 2.50
1966
89.38
2.55
2.20
1965
101.98
2.43
2.10
1964
95.98
2.35
2.06
1963
89.64
2.16
1.87
1962
79.13
2.12
1.83
ULTIMATE FINDING OF FACT
The fair market value of the EICO stock decedent owned at the time of her death was $65.83 per share.
OPINION
Once again we are asked to try our hand at the uncertain art of securities valuation because the parties have been unable to draw a settlement to their own liking, despite strenuous efforts by the Court to persuade them to achieve a disposition of their dispute through the negotiation process. The applicable statute, [2] respondent's regulations [3] and rulings, [4] and 8 the case law can offer no more than generalized guidelines for the valuation of closely-held stock, and we are therefore left to resolve this case by yet another "Solomon-like pronouncement." See Morris M. Messing, 48 T.C. 502, 512 (1967).
*291 Since almost all of the assets of EICO consisted of cash, commercial paper, and marketable securities, there neither was nor could be any substantial disagreement between the parties as to the underlying net asset value per share of EICO stock. We have found that such value was $99.74 per share as of the date of decedent's death. From that point, we confront the crux of the disagreement between the parties - determining the proper discount to be applied against this underlying net asset value to arrive at the fair market value of the EICO stock for estate tax purposes. The parties have advanced various factors for us to take into account, such as the lack of marketability for a minority interest in a close corporation, the restraints on stock transfer specified in the bylaws of the corporation, the substantial appreciation of the corporation's assets over their cost basis, and the corporation's history of earnings and dividends.
The extensive financial data and opposing expert appraisals introduced by the parties have established 9 for us what we think is the reasonable range within which the fair market value of the stock must lie. Not being as addicted to "talismanic precision" *292 (see Morris M. Messing, supra ) as are the parties or their experts, we can only outline some of the necessarily imprecise considerations that led to the $65.83 per share figure that constitutes our ultimate finding of fact herein. We emphasize that our articulation of those considerations is not intended to be all-inclusive and that our conclusion rests on a weighing of all facts and circumstances revealed by the entire record herein and with due regard to the fact that the burden of proof is on the petitioner.
The 50-percent discount from underlying net asset value advocated by petitioner seems to us excessive. The factor most heavily relied upon by petitioner's expert appraiser was the first refusal restriction applicable to any sale of EICO stock to someone other than a present shareholder of the corporation, descendants of decedent's father, or trustees for the benefit of a shareholder's spouse or issue. We note first that the restriction on transfer in the instant case specified no stated or formula price (such as 10 book value per share) at which the shares had to be offered to the other shareholders or the corporation before they could be sold to a third *293 party. In most situations, particularly where an operating company is involved, a right of first refusal without a fixed price will have little, if any, effect on fair market value (see James Couzens, 11 B.T.A. 1040, 1065 (1928)) and clearly will have a less drastic effect than fixed-price restrictions such as the ones involved, for example, in Worcester County Tr. Co. v. Commissioner, 134 F.2d 578, 581-582 (C.A. 1, 1943), reversing Estate of James Smith, 46 B.T.A. 337, 340 (1942), Estate of Pearl Gibbons Reynolds, 55 T.C. 172, 188-190 (1970), and Mathews v. United States, 226 F. Supp. 1003 (E.D.N.Y. 1964).
Moreover, as one court has said in a context similar to that herein, a reciprocal right of first refusal pertaining to each shareholder of a corporation "is directed to creating in each stockholder's stock an equity in favor of the other stockholders, to creating, that is, as an incident of each stockholder's stock ownership a veritable property interest in the stock of every other stockholder, " thus creating in some *294 degree a countervailing 11 element of enhancement of value. (Emphasis added.) See Mathews v. United States, supra, 226 F. Supp. at 1007. Nevertheless, where the bulk of the underlying assets of the shares of a corporation constitutes securities subject to the vagaries of the stock market, such a right of first refusal constitutes a depressant of the value of such shares, at least insofar as a prospective purchaser may lower his offering price to reflect a possible deterioration in the market value of those assets during the specified non-sale period (90 days, in this case). As a consequence, we think that, in the context of this case, the EICO bylaw restriction should be accorded some depressant effect.
The restriction, however, falls far short of justifying a 50-percent discount and we find the record herein totally lacking in probative evidence justifying a determination of such a discounted value for the shares involved herein. [5]
*295 12 On the other hand, we think that the discount from net asset value of approximately 20 percent advocated by respondent is an inadequate reflection of the various elements of valuation which should properly be taken into account. Respondent's expert appraiser afforded greatest weight in his appraisal to a comparison of the EICO stock owned by decedent with the stock of nine publicly traded, closed-end investment companies, and particularly the price to net-asset-value-per-share ratio for the stock of those companies at the date of decedent's death. While we found this comparison helpful in setting the reasonable range within which the fair market value of EICO's stock must lie, we think that the stock of EICO is much less comparable to that of the nine companies used in the appraisal than respondent would have us believe. Foremost among the distinctions are the ready marketability of the shares of those nine companies and their qualification, unlike EICO, as regulated investment companies entitled to the tax benefits that such qualification entails. [6]
In short, we agree neither with *296 respondent's appraisal nor with petitioner's, but think rather that 13 the fair market value of decedent's EICO shares falls well inside the two extreme valuations advocated by the parties. Our demarcation point of $65.83 a share reflects, we think, a due regard for the nature of EICO's business and its assets, the book value and financial condition of EICO's business, its earnings and dividend-paying capacities, the minority interest of the decedent, and the impact of the restriction on transferability of decedent's shares. See Rev. Rul. 59-60, 1959-1 C.B. 237. That the price we have found happens to coincide with the value reported for estate tax purposes and that it represents the same discount element utilized by EICO in determining the price at which the shares were redeemed from the estate is not, in our opinion, determinative. While transactions involving a family group should be given special scrutiny, it does not follow that the terms of such transactions should necessarily be disregarded. On the basis of the record before us, we are satisfied that the value we *297 have determined, based upon a discount of 34 percent, represents the price that a willing buyer would have paid 14 a willing seller, neither being under any compulsion to buy or sell.
Decision of no deficiency and no overpayment will be entered. Footnotes
1. We use the term "underlying net asset value per share of EICO stock" to mean the fair market value of EICO's total assets minus its total liabilities, divided by the total number of EICO shares outstanding. ↩
2. Sec. 2031, Internal Revenue Code of 1954↩.
3. Sec. 20.2031-2(f), Estate Tax Regulations.↩
4. Rev. Rul. 59-60, 1959-1 C.B. 237↩.
5. Petitioner introduced evidence regarding decedent's solicitation of offers to sell 500 shares of her EICO stock to the other shareholders of the corporation in September 1964 and the resulting offers she received from some of them. We are unable to attach any weight to such evidence, however, because the bona fides of such solicitation and offers has not been established to our satisfaction and, at any rate, the proposed sale was never transacted. ↩
6. See sections 851- 855, Internal Revenue Code of 1954↩.