RAYMOND J. MOORE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 2708, 2844. Promulgated August 7, 1944.

*Stanley S. Waite, Esq.*, for the petitioner.
*James J. Waters, Esq.*, for the respondent.

**OPINION.**

SMITH, *Judge*: These proceedings, consolidated for hearing, involve income tax deficiencies for 1940 and 1941 in the respective

amounts of $3,299.81 and $3,665.97 (Docket No. 2844), and a gift tax deficiency for 1940 in the amount of $1,764.44 (Docket No. 2708).

The only issue relating to the income tax deficiencies is whether petitioner is taxable on the income of a trust which he created in 1940 for the benefit of his wife. The value of the corpus of the trust at the date of the gift is the only question involved in the gift tax proceeding.

All of the facts are stipulated.

Petitioner is a resident of St. Louis, Missouri. He filed his income tax returns for 1940 and 1941 and his gift tax return for 1940 with the collector of internal revenue for the first district of Missouri at St. Louis.

During the taxable years and for several prior years petitioner was secretary, treasurer, and one of the directors of the R. E. Funsten Co. He was the owner on June 6, 1940, of 51 of the company's outstanding shares of'stock. The number of shares outstanding at December 31, 1939, was 726. By a declaration of trust executed on June 6, 1940, he declared himself trustee to hold 23 of such shares for the benefit of his wife for life, with remainder over either to her appointees or to the children of her and petitioner. There were then 5 children, one of whom was 23 years of age and 4 of whom were minors. The net income of the trust was to be paid to the wife for her life, "for her own separate use and benefit." There were numerous provisions not here material affecting the payment or administration of the net income to or for the use of the children after the wife's death.

In addition to the net income of the trust, the trustee was required to make such payments to the wife out of the trust assets as she might from time to time demand, with the consent of the other adult beneficiaries. The trustee was authorized to encroach further upon the principal of the trust for the use and benefit of any of the beneficiaries, "to provide for their proper maintenance and support or to provide against any emergency which may arise affecting them occasioned by sickness, accident, ill health, misfortune, or otherwise," except that he could not pay out any of the assets "to provide support or maintenance for which I am liable, or in any wise for my benefit."

Petitioner, as grantor, retained no beneficial interest whatever in the trust property and reserved no power to revoke, alter, or amend the trust. The powers which he retained as trustee other than those mentioned above were of an administrative nature, relating to the management and preservation of the trust estate, and were not in excess of the powers usually granted to the trustees of such trusts.

None of the trust principal has ever been distributed to any beneficiary and no additional funds have ever been paid into the trust. Each year the petitioner as trustee has caused the dividends on the trusteed shares to be credited to his wife on the books of the company,

to be held subject to her demand, with interest at 3 percent. She has withdrawn some of the dividends, depositing them in her separate bank account, and has left some of them to her credit with the company. She reported all of the net income of the trust in her individual income tax returns for 1940 and 1941 in the amounts of $9,228.75 and $9,200, respectively.

All of the issued stock of the R. E. Funsten Co. was held under a stockholders' agreement which prohibited its owner from disposing of it without offering it first to the directors of the company in their individual capacity and, if they refused it, then to the other stockholders. Either the directors or stockholders were to have the option to purchase the shares at their book value at the date of the last preceding inventory, plus 6 percent interest thereon to the date of sale, less the dividends declared and paid during the interim. The holdings of any deceased shareholder or those of any shareholder leaving the service of the company, either voluntarily or otherwise, were also to be subject to the terms of the restrictive agreement. The agreement was binding upon the heirs, successors in interest, transferees, executors, administrators, and assigns of the stockholders. The stockholders all gave their consent to the transfer of the shares to the petitioner as trustee upon the condition that he should hold them subject to the restrictive agreement. It was provided in the declaration of trust referred to above that the transfer of the shares to the trust was made subject to the restrictive agreement.

The adjusted book value of the shares in question on June 6, 1940, computed in accordance with the restrictive agreement, was $1,763.04 per share. That valuation was used by petitioner in computing the amount of the gift to his wife in the gift tax return which he filed for 1940.

It is stated in the stipulation of facts:

As of December 31, 1939, the Company's net worth based on book values was $1,388,599.90; of which $1,315,999.90 was earned surplus. For the years 1936 to 1940, inclusive, the Company's sales, net income and dividends paid were as follows:

| Year | Gross Sales | Net Income | Dividends Paid |
|---|---|---|---|
| 1936 | $3,293,111.00 | $593,306.00 | $595,000.00 |
| 1937 | 3,122,346.00 | 426,537.00 | 420,000.00 |
| 1938 | 2,903,161.00 | 383,443.00 | 397,650.00 |
| 1939 | 3,496,141.00 | 449,709.00 | 435,600.00 |
| 1940 | 3,745,743.00 | 398,279.00 | 387,000.00 |
| Totals (5 years) | | $2,251,274.00 | $2,235,250.00 |
| Average | | $450,254.80 | $447,050.00 |
| Per share (726 shares) | | $620.18 | $615.77 |

Notwithstanding the agreement, of which he had knowledge, respondent determined the value of the stock to be $3,636.34 per share on June 6, 1940. The

average annual dividends paid for the years 1936 to 1940, inclusive, are equivalent to a return of approximately 17% on the value of $3,636.34 per share as determined by the respondent.

The respondent's contentions are that the trust was revocable to the extent of the excess of the fair market value of the trusteed shares over their option value under the restrictive agreement, and that petitioner, as grantor, is taxable under section 166, Internal Revenue Code, on the income attributable to such portion of the trust corpus. In his deficiency notice for 1940 and 1941 the respondent held petitioner taxable on all of the income of the trust for those years.

Respondent further contends, and he so determined in his notice of the gift tax deficiency, that the fair market value of the shares in question on June 6, 1940, the date of the gift, was $3,636.34 per share rather than $1,763.04 per share, as reported by petitioner in his gift tax return.

We think that the respondent was in error in holding petitioner taxable on any of the income of the trust for 1940 or 1941.

There can be no doubt that petitioner intended by the declaration under which the trust was created to make his wife a complete and irrevocable gift of the income of the trust for life. He reserved no powers or rights either as grantor or trustee by which he could revest in himself any of the income or principal of the trust. The respondent's present position is that by reason of the agreement restricting the sale of the shares transferred to the trust it was possible for petitioner, acting as an individual, to repurchase the shares from himself, acting as trustee, for the option price fixed under the agreement, thereby repossessing the excess of the actual value over the option value. Without hazarding a restatement of respondent's contention, we quote from his brief:

Under the restrictive agreement the petitioner as stockholder-director of the Company had and still has the right to purchase in his individual capacity the stock which he transferred under the declaration of trust. As trustee under the declaration of trust, he also has the unrestricted right to sell the trust property, which, during the years involved, consisted solely of the shares of stock in question. This right to sell the stock includes the right to sell the same to himself by reason of the fact that the shares were transferred in trust specifically subject to the restrictive agreement between the stockholders under which the petitioner as director of the Company enjoyed first rights to purchase individually any stock desired to be sold by a stockholder. In this connection it is significant that the petitioner was able to obtain waivers from the other stockholders in order to transfer the stock in trust. This clearly indicates that should he desire to repurchase the same such waivers could also be obtained from the other directors so as to effect the transaction.

It is the position of the respondent that during the taxable years here involved the value at which the petitioner could under the restrictive agreement purchase the stock was $1,763.04 per share and that the actual value of the stock was $3,636.34 per share (Pars. 17, 18, S/F). Thus the petitioner has reserved a power

to reacquire a portion of the trust property. The trust is, therefore, revocable within the meaning of section 166 of the Code as to the excess value of the property which may be reacquired over the amount to be paid therefor by the petitioner. *Charles T. Fisher*, (1933) 28 B. T. A. 1164. Cf. *Chandler* v. *Commissioner*, (C. C. A.-3, 1941) 119 Fed. (2d) 623; *Estate of William J. Garland*, (1941) 43 B. T. A. 731, 735.

This argument is condemned by its tenuousness, even if the factual premises were justified. Tax assessments require a more solid footing than that which respondent proposes. Under section 166 the basis for the tax liability is the power in the grantor to repossess the corpus of the trust. This power must be one that is present, definite, and exercisable by the grantor or someone not holding an adverse interest in the trust property.

There is no justification in the evidence before us for assuming that petitioner would have been able to gain the assent of all of the other directors and stockholders of the R. E. Funsten Co. to a transfer of the shares to himself for the purpose of stripping the trust of a portion of its assets. Such a power, if a power at all, is not the power contemplated by the statute.

We do not think that petitioner is taxable on the income of the trust under section 166 or any other provision of the statute.

This leaves the question of the value of the 23 shares of R. E. Funsten Co. stock for gift tax purposes. Respondent has determined that the shares had a value on the date of their conveyance to the trust, June 6, 1940, of $3,636.34 per share, or a total value of $83,653.82, instead of $1,763.04 per share, or a total value of $40,549.92, as reported by petitioner in his gift tax return.

Section 1005, Internal Revenue Code, provides: "If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift."

Regulations 108 provides in part as follows:

*Sec. 86.19. Valuation of Property.—*

\* \* \* \* \* \* \*

(c) *Stocks and Bonds.*—The value at the date of the gift in the case of stocks and bonds, within the meaning of the statute, is the fair market value per share or bond on such date.

\* \* \* \* \* \* \*

If actual sales or bona fide bid and asked prices are not available, then, in the case of corporate or other bonds, the value is to be arrived at by giving consideration to the soundness of the security, the interest yield, the date of maturity, and other relevant factors, and, in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock. \* \* \*

Petitioner contends that the fair market value of the shares in question was fixed by the terms of the stockholders' agreement which was in effect at the time the trust was created. He points out that in

prior years there have been a number of sales of the shares at the prices fixed by the agreement, or similar agreements which have been in effect since 1914, and that none of the shares have ever been sold for any greater price. Among the cases upon which petitioner relies are *Helvering* v. *Salvage*, 297 U. S. 106; *Wilson* v. *Bowers*, 57 Fed. (2d) 682; *Lomb* v. *Sugden*, 82 Fed. (2d) 166; and *Commissioner* v. *Bensel*, 100 Fed. (2d) 639. The three last cited cases all involved the valua-- tion of shares of stock for estate tax purposes. In *Wilson* v. *Bowers*, *supra*, the decedent held the shares at the date of his death subject to an option agreement giving the other stockholders the right to purchase them at a stipulated price for a period of four months following the owner's death. The agreement imposed the same restriction on the sale of the shares by decedent during his lifetime. Holding that the fair market value of the shares was fixed by the option agreement, the court said:

Since the contract was specifically enforceable, it seems obvious that the sale value of the stock during the testator's life could have been no more than the low price at which he was obliged to offer it, first, to Franklin Wilson, and then to Betts; nor could his executors have sold it for more, unless both the option holders had allowed their options to lapse. * * *

To the same effect is *Lomb* v. *Sugden*, *supra*, which followed the *Wilson* v. *Bowers* case and *Commissioner* v. *Bensel*, *supra*.

In support of his determination of a value in excess of the option price for the shares in question respondent relies upon *Charles T. Kline*, 44 B. T. A. 1052; affd., 130 Fed. (2d) 742; certiorari denied, 317 U. S. 697. The *Kline* case, like the instant case, involved a valuation for gift tax purposes of shares of stock of which a donor had declared himself trustee for the benefit of his wife and others at a time when they were subject to a restrictive agreement in many respects similar to that involved in the instant case. The stockholder-employee could sell his shares only with the company's consent, and upon termination of his employment the company was to have the right to repurchase them at the price of 75 percent of their book value on the last closing in case of death or resignation, 50 percent should the employee resign under unfavorable conditions, and $33\frac{1}{3}$ percent should he be discharged for cause. In sustaining the Commissioner's valuation of the shares, which was based on 75 percent of the book value, whereas the taxpayer claimed a value based on the most unfavorable terms, $33\frac{1}{3}$ percent of the book value, we said:

In several cases the price at which shares had to be offered to others under restrictive agreements has been regarded as the limit of fair market value, *Salvage* v. *Helvering*, 297 U. S. 106; *Wilson* v. *Bowers*, 57 Fed. (2d) 682; *Commissioner* v. *Bensel*, 100 Fed. (2d) 639; *Lomb* v. *Sugden*, 82 Fed. (2d) 166. But the agreements considered in them were between parties who might be expected

to press their bargaining advantage. In *Wilson* v. *Brown, supra*, the court thought "the possibility that the operations would not be exercised seems too extravagant to require further refutation." Here, on the contrary, it seems unlikely that any event prior to petitioner's death will require the contractual offer and unlikely that it will be accepted even then. But, if acceptance be presumed, book value as of the close of the preceding year can not be foreseen, and hence no prospective sale price can be set.

We said further that, in view of the strong financial position and dividend record of the company, the Commissioner's valuation represented "a very substantial allowance for the adverse effect of the restriction agreement."

The sole reliance of petitioner as to the value of the transferred shares is the adjusted basis provided for by the restrictive agreement described above. He has submitted no evidence as to the value of the shares except such as is shown by the stipulated facts set forth above. The respondent does not deny that the restrictive agreement under which the shares are held is a factor to be considered in the determination of the fair value of the transferred shares for gift tax purposes; but he insists that it is only one factor. He further submits that his determination shows earnings available for dividends and the payment of dividends over the five-year period 1936 to 1940, inclusive, of $620.18 and $615.70 per share, respectively. These earnings and dividends are equivalent to a return of 17 percent on the value of the shares determined by the respondent.

In *Guggenheim* v. *Rasquin*, 312 U. S. 254, and *Powers* v. *Commissioner*, 312 U. S. 259, it was held that the cash surrender value of a single premium life insurance policy was not necessarily the value of the policy for gift tax purposes. The amount which either the donor or the donee could immediately realize upon the surrender of the policy was held not to be the sole criterion of value.

In the instant case the value to the trust and to the beneficiary was not necessarily the amount which could be realized from the sale of the shares. Those shares are being retained by the trustee for the income to be derived therefrom for the benefit of the beneficiary.

We think that a security upon which a return of in excess of $600 per year can be realized for a period of years, so far as anything can be seen to the contrary, has a value in excess of the adjusted book value of the shares as determined under the restrictive agreement. In the absence of evidence showing that the shares did not have a value for the purposes of the trust less than that determined by the respondent, his determination is approved.

*Decisions will be entered under Rule 50.*