**BALTIMORE NATIONAL BANK** and Zanvyl Krieger, Executors u/w Harry Goldberg, deceased,

v.

**UNITED STATES of America**
Abraham **KRIEGER**

v.

**UNITED STATES of America.**
Civ. Nos. 7439, 7421.

United States District Court
D. Maryland, Civil Division.
Dec. 12, 1955.

Richard W. Case, Baltimore, Md., for plaintiffs.

Donald P. Hertzog, Atty., Dept. of Justice, Washington, D. C., for defendant.

THOMSEN, Chief Judge.

These consolidated cases involve the valuation, for estate tax and gift tax purposes respectively, of deposit receipts for voting trust certificates for shares of Gunther Brewing Company common stock. The Goldberg case also raises the question whether the division by the decedent and his wife equally between themselves of such a deposit receipt and of stock certificates issued by other companies which they had formerly held as tenants by the entireties constituted a transfer in contemplation of death within the meaning of sec. 811(c) of the Internal Revenue Code of 1939.[1]

### The Goldberg Case

Dr. Harry Goldberg died on June 23, 1947. The estate tax return filed by his executors showed a tax of $14,474.41, which was paid to the Collector at Baltimore. Later, a statement in the nature of an amended return was filed, listing additional assets and showing an additional tax of $5,886.23, which was paid,

---

1. Sec. 811 of the Internal Revenue Code of 1939, as amended and in effect in 1946 and 1947, provided:

"The value of the gross estate of the decedent shall be determined by including the value at the time of his death of all property, * * *—

"(c) *Transfers in contemplation of, or taking effect at death.* To the extent of any interest therein of which the decedent has at any time made a transfer, by trust or otherwise, in contemplation of or intended to take effect in possession or enjoyment at or after his death, or of which he has at any time made a transfer, by trust or otherwise, under which he has retained for his life or for any period not ascertainable without reference to his death or for any period which does not in fact end before his death (1) the possession or enjoyment of, or the right to the income from, the property, or (2) the right, either alone or in conjunction with any person, to designate the persons who shall possess or enjoy the property or the income therefrom; except in case of a bona fide sale for an adequate and full consideration in money or money's worth. Any transfer of a material part of his property in the nature of a final disposition or distribution thereof, made by the decedent within two years prior to his death without such consideration, shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this subchapter".

with interest. Following negotiations, a notice of deficiency was sent to the executors, and on June 7, 1951, they paid to the Collector an estate tax deficiency in the amount of $53,469.63, plus $8,-446.00 interest, the full amount claimed in the deficiency notice. Most of the deficiency was based upon the inclusion in the gross estate of the following securities, valued by the Commissioner at the amounts listed: 100 shares First National Bank Baltimore, $4,950; 50 shares General Electric Company, $1,790.50; 150 shares McCrory Stores, Inc., $4,200; 26 shares Mercantile Trust Company of Baltimore, $7,852; 250 shares Pepsi Cola Company, $8,077.50; 50 shares Gunther Brewing Company, common v.t.c. @ $2,-500 per share, $125,000.

It is stipulated that these securities were included in the gross estate upon the determination by the Commissioner that they had been transferred by Dr. Goldberg to his wife on or about April 11, 1946, in contemplation of death. The balance of the deficiency came from increasing the value of another depository receipt representing a voting trust certificate for 50 shares Gunther Brewing Company common stock, admittedly includable in the estate, from $1,509.64 per share, at which it had been returned, to $2,500 per share.

On or about June 4, 1953, the executors filed a claim for refund of the deficiency and interest so paid, but have never received notice from the Commissioner in accordance with sec. 3772(a) (2), I.R.C., that their claim has been granted or denied.

### The Krieger Case

On December 10, 1946, Abraham Krieger made a gift to Zanvyl Krieger, Trustee for Jane Krieger, of a non-negotiable depository receipt for voting trust certificates for 50 shares of Gunther Brewing Co., Inc., common stock. Abraham Krieger filed a gift tax return, in which he valued the certificate at $1,305.30 per share, a total of $65,265, and paid a gift tax of $14,684.62 thereon. He received a letter determining a deficiency in gift

taxes in the amount of $29,797.32, based upon the determination by the Treasury Department that the fair market value of the depository receipt was $189,620, equivalent to $3,792.40 a share for Gunther common stock. On May 2, 1953, he paid to the Collector at Baltimore the deficiency claimed, with $5,024.32 interest, and on May 16, 1953, filed a claim for refund of said deficiency and interest. He has never received notification under sec. 3772(a) (2), I.R.C., that his claim for refund has been granted or denied.

The Collector to whom the payments were made was not in office when these actions were commenced.

### The Contemplation of Death Issue

#### Facts

Dr. Harry Goldberg, born in 1885, married Bertha Krieger, the sister of Abraham and Zanvyl Krieger and two other brothers now deceased. Dr. Goldberg started practice as a general practitioner, his wife acting as his nurse and secretary. In the 1920's he began to specialize in pediatrics, but never charged more than $2 for an office visit and $3 for a house visit. His earnings reached a peak of about $9,000 in 1927, and dropped to a level of $4,000 to $6,000 in the years 1936 to 1946. He was cheerful, interested in people and in his practice, eccentric in his eating habits, careless in his business affairs, a speculator in stocks and a gambler on the races. He was devoted to his wife and two sons, and was especially interested in the medical education and career of his son Herman, who has become a well-known ophthalmologist.

In the early days of the depression, Dr. Goldberg lost most of his savings except his life insurance; his wife had only a few thousand dollars, invested in stocks, an inheritance from a deceased brother.

Early in 1931 the Geo. Gunther, Jr., Brewing Co. went into receivership, and its brewery, located in Baltimore, which had been manufacturing ice during the prohibition era, was put up for sale at auction. Abraham Krieger was then a Vice President of the Finance Company

of America, of which Louis Eliasberg was the President. Krieger, Eliasberg and Samuel Hoffberger decided to offer $200,000 for the property, and to take title in the name of a new corporation, in which Krieger would have a 25% interest, Eliasberg 25%, and Merchants Terminal Corp., a Hoffberger enterprise, the remaining 50%. Krieger was to devote full time to running the business, and the directors were chosen from the Krieger-Eliasberg group.

Abraham Krieger did not then have $50,000; so he asked Dr. Goldberg if he (the doctor) could raise some money. Dr. Goldberg agreed to borrow on his life insurance, under which his wife was beneficiary, but on which he had the right to borrow. He did in fact borrow $9,001.47 on the insurance, and on July 28–30, 1931, turned the checks over to Krieger, who for some reason returned $100 to him the next day. During 1932 Dr. Goldberg made six additional advances totaling $1,016.64 to Krieger, who entered them on his books as loans, in a ledger account standing in the name of Dr. Harry Goldberg.

A bitterly contested issue in the case is whether (a) Dr. Goldberg was purchasing stock, or (b) lending money to Abraham Krieger, or (c) whether the transaction was really neither one nor the other, but an advance by Dr. Goldberg which Krieger agreed to repay if the venture was not successful, but which would result in the delivery of stock to Dr. Goldberg and his wife if it was successful.

It is not disputed that Krieger subscribed for 25% of the capital stock of the new corporation, i. e. 500 shares of preferred stock at $100 per share and 500 shares of common at $1 per share; that all of these shares were issued in the name of Abraham Krieger; and that he received and kept $50,000 when the preferred stock was redeemed at par in December, 1933. In the meantime a voting trust had been created, under which the shares representing the Krieger-Eliasberg interest in the common stock had been deposited. A voting trust certificate for 500 shares of common stock was issued to Krieger, and all of the 500 shares were held in his name until July 19, 1935. At that time Krieger transferred 100 shares to Dr. Goldberg and his wife on the books of the voting trustees, and a voting trust certificate for 100 shares was issued in their names as tenants by the entireties. The disputed question is whether the issuance of this certificate in their names as tenants by entireties (a) represented a gift by Dr. Goldberg to his wife of an interest in stock which he had purchased with his own money, or (b) was a gift by Abraham Krieger of 100 shares to Dr. Goldberg and his wife, made or promised at the conversation in July, 1931, and confirmed when beer was legalized in April, 1933.

The evidence on this question is voluminous, confusing and confused. It includes: (1) testimony by Mrs. Goldberg, Abraham Krieger and Zanvyl Krieger about a conversation which occurred twenty-four years ago; (2) an account on the ledger of Abraham Krieger in the name of Dr. Harry Goldberg, but which Abraham Krieger testified was intended to be a joint or family account, and which I find as a fact started out as an individual account but became a joint account for Dr. and Mrs. Goldberg at some time which cannot be accurately determined, but which I find to have been in the latter part of 1935 [2]; and (3) an affidavit of Abraham Krieger, prepared

---

2. My decision on this point is based partly on the facts (1) that the Baltimore Pure Rye stock which was purchased in 1933 and 1934 with part of the balance to the credit of this account was issued in the name of Dr. Goldberg alone; (2) that before and during 1935 dividends on Guaranty Trust stock, which belonged to Dr. Goldberg alone, were credited to this account, and no dividends on stocks belonging to Mrs. Goldberg were credited to this account; (3) that an account in the name of Mrs. Bertha K. Goldberg was opened by Abraham Krieger on his ledger in 1935; (4) that after the end of 1935 dividends on the

by Morton P. Fisher, now Associate Judge of the Tax Court of the United States, then counsel for Dr. Goldberg's executors in the estate tax controversy. That affidavit covered a number of disputed questions and was accompanied by a reconstruction or rationalization of the ledger account, but it contained no suggestion that the stock was a gift from Abraham Krieger to Dr. and Mrs. Goldberg. It stated, *inter alia:*

> "I held 500 shares of the common stock of the company in my name, of which 100 shares were held by me for the account of Dr. Harry Goldberg and Bertha K. Goldberg, his wife. The consideration for the purchase of 100 shares of preferred and 100 shares of common stock of Gunther Brewing Company was furnished by Dr. Harry Goldberg through the proceeds of loans on insurance policies on his life. In November, 1932, Dr. Goldberg purchased 40 additional shares of Gunther Brewing Company common stock, which 40 shares were issued to him. In July of 1935, the entire 140 shares were registered in the names of Dr. Harry Goldberg and Bertha K. Goldberg as tenants by the entireties."

I find that the issuance of the 100 shares, as well as of the 40 shares, in the name of Dr. Goldberg and his wife as tenants by the entireties represented a gift by him to her of an interest in the shares, and did not represent a gift by Abraham Krieger to them. I further find that this gift by Dr. Goldberg to his wife of an interest in the 100 shares was not made in contemplation of death. The subscription price for the common stock in 1931 was only $1 per share; and based on the testimony of Abraham and Zanvyl Krieger, I find that it was contemplated at the time of the transaction in July, 1931,

that Mrs. Goldberg should have some interest in the stock, if, as and when issued. The contemplation of death did not enter into the transaction at that time.

On July 18, 1935, the day before the voting trust certificates for the 140 shares of Gunther stock were issued in the names of Dr. Goldberg and his wife as tenants by the entireties, Dr. Goldberg transferred certificates for small amounts of stock in six other companies and Mrs. Goldberg transferred certificates for small amounts of stock in five other companies to their names as "tenants by the entireties and upon the death of either, to the survivor".

On July 23, 1935, Dr. Goldberg created a trust for the benefit of his two sons in Baltimore Pure Rye stock which he had purchased a year or two before. On October 18, 1935, Dr. Goldberg placed his insurance in trust for his wife for life and upon her death for his sons. And in 1941 Dr. and Mrs. Goldberg placed in trust for the benefit of their sons the voting trust certificate for the 40 shares of Gunther stock which Dr. Goldberg had purchased in 1932.

The government argues that these transfers show a pattern or plan of avoiding estate taxes. The executors argue that they were made to prevent the doctor from speculating with his assets, to provide assured income for his sons, and for other "life" reasons, and were not made in contemplation of death. Life motives, including the proper avoidance of gift taxes and income taxes, were present in the transfers; but all of them had the effect of taking property out of the gross estates of Dr. Goldberg, or Mrs. Goldberg, or both, for estate tax purposes; and in the case of one trust, the income was accumulated and not paid over to the sons, one of whom at least did not even know about the trust. These

---

Gunther stock, which then stood in the names of Dr. and Mrs. Goldberg as tenants by the entireties, were credited to the account; and (5) that the account was finally closed out by a note to both of them. In October, 1933, about the time it was decided to redeem the Gunther preferred stock, the account

was charged with 100 shares of Gunther preferred valued at $10,000, and 100 shares of common valued at $100. $10,000 received by Abraham Krieger in redemption of the preferred stock in December, 1933, was credited to the account.

transactions, and the fact that Mrs. Goldberg paid the premiums on the life insurance during the period that it was advantageous tax-wise for her to do so, convince me that the doctor's advisers were conscious of tax problems, that they discussed the problems with him, and that the doctor was following their advice.

In 1936 and again in 1937 Dr. Goldberg entered the Johns Hopkins Hospital for observation because of cardiac arrythmia (ventricular extrasystoles), which he had noticed two years before, and gastric difficulties, which he had had for some time because of his eccentric eating habits. However, the final diagnosis by Dr. Charles Austrian was "No disease", and I find as a fact that Dr. Goldberg did not worry about his health and had no expectation of an early death from that time until the onset of his fatal illness in the spring of 1947.

In 1943 Dr. and Mr. Goldberg sold most if not all of the stocks they had held for some years, and invested the proceeds, as well as a large part of the dividends they were receiving jointly from Gunther, in 200 shares First National Bank of Baltimore, 100 shares General Electric Company, 300 shares McCrory Stores, Inc., 52 shares Mercantile Trust Company of Baltimore, and 500 shares Pepsi Cola Company, all of which had a value in April, 1946, of about $50,000, and all of which were registered in their names as tenants by the entireties.

Their income tax returns had been made out for many years by B. J. Weigman, Treasurer of the Gunther Company; he had had trouble keeping track of their income, deductions, sales and reinvestments, because of their carelessness in keeping records, and had suggested that they keep three bank accounts, one for each individual's funds and one for their joint income and principal. He testified that this arrangement did not work, although he admitted that he had never checked the accounts. In April, 1946, he suggested to Abraham Krieger that Dr. and Mrs. Goldberg split between them the stock they held as tenants by the entireties, because, he testified, he was having difficulty keeping track of the dividends, was worried about unidentified deposits, and feared a check-up by Internal Revenue agents. How the splitting would help, when he never checked the bank accounts, got the dividend figures from Moody's dividend manuals, and would have twice as many dividend checks to keep track of, was not explained to my satisfaction. Abraham Krieger reported the suggestion favorably to Dr. Goldberg, who checked with Zanvyl Krieger, just returned from his service in the armed forces. Zanvyl Krieger is a lawyer, and except for the period of his service, lived with the Goldbergs. He approved the division and it was made in April, 1946; the Gunther voting trust certificates and the shares in the five other companies listed above were divided equally between Dr. Goldberg and his wife.

## Conclusions

The executors admit that the effect of the division was beneficial tax-wise; at the very least it gave them an additional and, so far as I am concerned, the only convincing argument that the shares received by Mrs. Goldberg in the division should not be included in Dr. Goldberg's gross estate for estate tax purposes. But they argue that the effect is immaterial if the thought of death was not the impelling cause or motive of the transfer. United States v. Wells, 283 U.S. 102, 118, 51 S.Ct. 446, 75 L.Ed. 867; Allen v. Trust Co. of Georgia, 326 U.S. 630, 66 S.Ct. 389, 90 L.Ed. 367. It is hard to believe that the trifling and unpersuasive reason suggested by Weigman was the impelling motive of the division by persons whose actions over the years indicate that they and their advisers were quite tax-conscious. I find that the executors have not met the burden resting on them to show that the division was not impelled by motives which included, as a major factor, the saving of estate taxes. Tait v. Safe Deposit & Trust Co., 4 Cir., 74 F.2d 851, 854. But that finding does not settle the matter.

Under the Maryland law Mrs. Goldberg had a property interest in the stocks. Dr. Goldberg could not have made any disposition of any part of them without her consent, and could not even have obtained a division of the stocks in partition proceedings, as an ordinary joint tenant could have done. Marburg v. Cole, 49 Md. 402; Brewer v. Bowersox, 92 Md. 567, 48 A. 1060; Masterman v. Masterman, 129 Md. 167, 98 A. 537; Elko v. Elko, 187 Md. 161, 49 A.2d 441, 168 A.L.R. 256; Settle v. Settle, 56 App. D.C. 50, 8 F.2d 911, 43 A.L.R. 1079; 26 Am.Jur., Husband and Wife, sec. 81. I find that Mrs. Goldberg owned an interest in those stocks, *per tout et non per my*; that she had put up at least one-half of the consideration for all of them except the Gunther certificate; and that her consent to the division and to Dr. Goldberg's receiving one-half of the shares constituted an adequate and full consideration in money's worth for the transfer to her of the other half of the shares. The shares which she received in the division, therefore, should not be included in Dr. Goldberg's gross estate for federal estate tax purposes. Sec. 811(c), I.R.C. of 1939.

This conclusion is fully supported by Sullivan's Estate v. Commissioner, 9 Cir., 175 F.2d 657, and is not contrary to any decision to which I have been referred.

In the Sullivan case a husband and wife owned certain property in joint tenancy. In November, 1943, about two months before the husband's death, their attorney advised them that it was against their interest to hold the property in this fashion and that if the property were held as tenants in common the value of property to be included in his gross estate for estate tax purposes would be less. Acting on this advice, they entered into a contract which severed the joint tenancy and converted their interest in the property to a ten-ancy in common. See 10 T.C. 961, at pages 963, 964. The estate admitted that the action was taken for the purpose of reducing death taxes. Nevertheless the Court of Appeals held that the division was a bona fide transfer for money's worth because the wife's interest transferred to the husband was worth at least as much as the husband's interest transferred to her; and therefore the portion transferred to the wife was not includable in the husband's gross estate under sec. 811(c).[3] The court said, 175 F.2d at pages 659, 660:

"The commissioner also contends that under section 811(c) any transfer in contemplation of death is taxable because it, to that extent, reduces the decedent's estate at his death. The face of the section shows the contrary and the Supreme Court has so held. There was no compulsion on the co-tenants to continue the joint tenancy so that this taxable event would occur. 'The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits cannot be doubted.' Gregory v. Helvering, 293 U.S. 465, 469, 55 S. Ct. 266, 267, 79 L.Ed. 596, 97 A.L.R. 1355. 'A taxpayer may arrange his business transactions so they may or may not be taxable under the phraseology of the taxing act.' Pacific Southwest Realty Co. v. Commissioner, 9 Cir., 128 F.2d 815, 818."

The government seeks to distinguish the Sullivan case because the property there was held in joint tenancy rather than in a tenancy by the entireties. There is no force in this contention. The essence of both tenancies for estate tax purposes is the right of survivorship; in both cases the entire property would have been includable in the husband's estate if the division had not been made; in both cases the wife had

---

3. The statutory provisions were the same, or essentially the same, in 1943–4 (Sullivan) as in 1946–7 (Goldberg). And although Mrs. Goldberg was a little older than Dr. Goldberg, the longer life expectancy of women made the value of her interest substantially the same as his.

a valuable interest in the property.[4] The portion of the opinion quoted above states well-recognized principles which are applicable in the case at bar.

The government cited Tyler v. U. S., 281 U.S. 497, 50 S.Ct. 356, 74 L.Ed. 991; Commonwealth Trust Co. of Pittsburgh v. Driscoll, D.C.W.D.Pa., 50 F.Supp. 949, affirmed per curiam 3 Cir., 137 F.2d 653; and Steen v. U. S., 9 Cir., 195 F.2d 379. In the Tyler case, at the time of the death of the Maryland decedent, he and his wife owned as tenants by the entireties certain stock of which the husband had been the sole owner and which he had later conveyed to himself and his wife. Of course the entire value of the stock was includable in his gross estate under the statute, and the only point argued was a constitutional point. The court noted, however, that neither tenant could dispose of any part of the estate without the consent of the other, and that the Maryland decisions establish a state rule of property by which the Supreme Court is bound. 281 U.S. at pages 501, 503, 504, 50 S.Ct. at pages 358, 359.

In the Commonwealth Trust case the decedent owned property which he conveyed to himself and his wife as tenants by the entirety. In 1932 he caused these properties to be transferred from himself and wife as tenants by the entirety to his wife alone. The court found that the 1932 transfer was made in contemplation of death and that the property was includable in the husband's gross estate. But in that case the wife gave no consideration for the 1932 transfer of the entire title to her. In our case Mrs. Goldberg gave full consideration for the transfer of certain shares to her in the 1946 division, namely, the giving up of her interest in the shares transferred to her husband, which interest she had acquired at various times—when the several stocks were purchased with money belonging both to her and her husband, and when the voting trust certificate for Gunther stock was issued in their names as tenants by the entireties. Although she had paid nothing for her interest in the Gunther certificate, it constituted a property right under the Maryland law. See cases supra. If the original issuance of the Gunther shares in the names of Dr. and Mrs. Goldberg as tenants by the entireties had constituted a gift made by Dr. Goldberg in contemplation of death, we might have a different case so far as the Gunther certificate is concerned. But I have found as a fact that that 1931–1935 transaction by which the voting trust certificate for Gunther common stock was issued in their names as tenants by the entireties was not a gift in contemplation of death. This case is like the Sullivan case and not like the Commonwealth Trust case.

In Steen v. U. S., 9 Cir., 195 F.2d 379, also cited by the government, the court held that joint property owned by the decedent and his wife at the time of his death, and acquired with funds which consisted of community property received as compensation for personal services actually rendered by decedent, should be included in his gross estate for federal estate tax purposes. That holding is not in conflict with the Sullivan case, which was distinguished by the court in its opinion. Indeed the District Court in Steen held that the Commissioner erroneously included in the gross estate of the decedent "the sum of $6,971.13 as transfers made in contemplation of death during the decedent's life, whereas, there was, in fact no transfer of that sum, but a division of jointly held property into property held in tenancy in common, of which property at the date of death, $6,971.13 represented the wife's undivided one-half interest", Steen v. U. S., 51 U.S.T.C. par. 10818; and the government did not appeal from that ruling.

The shares of stock which Mrs. Goldberg received in the 1946 division are not includable in the gross estate of Dr. Goldberg for federal estate tax purposes.

### The Valuation Issue
#### Facts

The Goldberg case deals with the valuation, for *estate* tax purposes, of a de-

---

4. The Tax Court opinion in the Sullivan case indicates that the property involved was not and never had been community property. 10 T.C. 961, 963.

pository receipt for the 50 shares admittedly includable in his gross estate.[5] This valuation must be made as of June 23, 1947, the date of his death. In the Krieger case we are dealing with the valuation for *gift* tax purposes of a depository receipt for 50 shares, the subject of a deed of trust by Abraham Krieger on December 10, 1946, the day after the depository agreement of November 1, 1946, became effective.

The Gunther brewery was purchased at auction on August 2, 1931, for $200,000 by a new corporation now known as Gunther Brewing Company. Abraham Krieger and his family had a 25% interest in the new corporation, Louis Eliasberg and his family 25%, and Merchants Terminal Corporation, a Hoffberger enterprise, 50%. Although Abraham Krieger was elected president of the company and the directors were chosen from the Krieger-Eliasberg group, Krieger and Eliasberg were concerned about a possible conflict of interest, since Gunther was then manufacturing ice, together with some near beer, and the Hoffbergers were also in the ice business. On August 10, 1931, in order to solidify their interest, Krieger and Eliasberg entered into a voting trust agreement covering their 50% of the stock. After beer was legalized in April, 1933, Gunther's beer business was so successful that the Hoffbergers decided to organize a brewing company of their own, the National Brewing Company, which started in business in February, 1934, and has been an active competitor of Gunther ever since.

The Krieger-Eliasberg stockholders executed new voting trust agreements in 1937 and 1943, but since no voting trust in Maryland may last beyond ten years, they were worried lest some one of their associates might sell even a single share to the Hoffbergers, which would give the Hoffbergers control of the corporation at the expiration of the current voting trust.

Because of this fear they consulted Frederick W. Brune, now Chief Judge of the Court of Appeals of Maryland, then a leading corporation lawyer in Baltimore. After considering the problem for about two years, Brune recommended and prepared an agreement which was executed as of November 1, 1946, by Krieger, Eliasberg, and all of the other holders of voting trust certificates representing the Krieger-Eliasberg 50% interest in the Gunther Company. Judge Brune testified that under the agreement (unless it should be terminated) Messrs. Eliasberg and Krieger (or the survivor of them, or their successor or successors in interest as purchaser or purchasers) are to become the owners of all of the stock deposited under the agreement within a period not to exceed thirty-five years from its effective date. In the meanwhile, however, Messrs. Krieger and Eliasberg (or their successors in interest) have the power to control the voting of the stock subject to the agreement and its deposit or redeposit under a voting trust agreement, though in case of disagreement as to voting or as to any such deposit, between them and any seller, in order to exercise their power of control, they may have to buy the stock of such seller earlier than they would otherwise have to do. These provisions were adopted for the purpose of obviating any objections which might be raised to the validity of the agreement on the ground that it was in effect a voting trust agreement to continue in force for a longer period than that allowed by the law of Maryland. Judge Brune also testified that in his opinion the agreement was valid under Maryland law.

The price at which common stock or voting trust certificates therefor must be sold and purchased under the terms of the agreement was fixed at 110% of the book value thereof as shown by Gunther's balance sheet contained in its federal income tax return for its last fiscal year preceding the date of sale, with certain minor additions, subtractions and qualifications which need not be set out here.

5. If the government had prevailed in its contemplation of death contention, the number of shares would have been 100, but that would not have affected my decision on the value per share.

The agreement required all signatories to deposit their stock or voting trust certificates with a depository, and accept non-negotiable depository receipts in exchange therefor. It also contained provisions permitting any seller within sixty days after the agreement became effective (December 9, 1946), to sell, give or transfer in trust, any or all of their shares to others, who would become subject to the terms of the agreement. A trust created pursuant to this provision might last for thirty-five years without the transferee, trustee or individual, being required to sell the stock. Finally it contained a provision permitting amendments, with the consent of all holders of depository certificates. Pursuant to this provision an amendment was approved in 1953 changing the agreed value to a complicated formula price because, Krieger and Eliasberg testified, the heavy reinvestments in plant had increased the book value and therefore the agreed value to a point where the survivor could not practically afford the purchase.

The government contended that the agreement was a sham, entered into to fix the value of the shares for estate tax purposes. This contention was completely answered by Judge Brune, who testified that although "the matter of possible estate taxes, or the basis upon which they would be imposed, came into discussion, it was not a matter of any major consideration. It naturally had to come into discussion because, for one thing, the agreement provided for the sellers selling their stock at the time of their death. And dying is almost always a matter now of interest to the United States Government."

I find that tax matters were not the motivating cause for the execution of the agreement.

I further find Abraham Krieger and Eliasberg acted in good faith in asking their family and friends to sign the agreement of November 1, 1945. I find that both of them believed that the danger to all of the Krieger-Eliasberg stockholders of any one of them selling a single share to the Hoffberger interests was very real, and believed that this danger reduced the actual value of their stock, and made preferable the restrictive terms of the November 1, 1945, agreement.

Gunther's operations may be summarized as follows:

Table A.

Net Amounts Per Share

| Years Ended Dec. 31 | Net Sales | Net Income After Tax | Cash Dividends | Tangible Book Value Per Share (Common) |
|---|---|---|---|---|
| 1933 | $ 1,948,055.70 | $226.98 | $ None | |
| 1934 | 3,395,994.66 | 249.00 | 100.00 | $ 318.18 |
| 1935 | 4,246,823.68 | 295.70 | 100.00 | 523.36 |
| 1936 | 3,723,026.71 | 192.56 | 100.00 | |
| 1937 | 4,090,422.11 | 186.72 | 100.00 | |
| 1938 | 4,257,151.74 | 262.09 | 150.00 | |
| 1939 | 4,266,753.00 | 293.56 | 200.00 | |
| 1940 | 4,316,017.00 | 232.62 | 200.00 | |
| 1941 | 5,272,274.00 | 277.96 | 200.00 | 1,021.88 |
| 1942 | 5,908,638.84 | 234.63 | 200.00 | |
| 1943 | 6,851,220.84 | 248.12 | 200.00 | |
| 1944 | 7,597,077.20 | 237.88 | 200.00 | |
| 1945 | 7,795,103.63 | 242.53 | 200.00 | 1,191.72 |
| 1946 | 7,598,318.48 | 385.76 | 200.00 | 1,372.40 |
| 1947 | 11,580,645.00 | 562.09 | 200.00 | 1,734.76 |

The testimony of the several expert witnesses on the question of valuation will be set out below, after a discussion of the applicable law.

### The Applicable Statutes and Regulations.

The tax effects of restrictive agreements are not prescribed by any provision of the Internal Revenue Code or of the estate or gift tax regulations in force in 1946–7. Both the estate and gift tax provisions of that Code, Sections 811 and 1005 respectively, imposed a tax upon the "value" of the property in question. Section 811(k), added in 1944, provided:

"Valuation of unlisted stock and securities. In the case of stock and securities of a corporation the value of which by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined taking into consideration, in addition to all other factors, the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange."

Regulations 105 (Estate Tax) sec. 81.-10, provided:

"Valuation of property.—(a) General.—The value of every item of property includible in the gross estate is the fair market value thereof at the time of the decedent's death; * * * The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. * *. * Such value

is to be determined by ascertaining as a basis the fair market value as of the applicable valuation date of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. All relevant facts and elements of value as of the applicable valuation date should be considered in every case.

\* \* \* \* \* \*

"(c) Stocks and Bonds.—The value of stocks and bonds, within the meaning of the Internal Revenue Code, is the fair market value per share * * * on the applicable valuation date.

\* \* \* \* \* \*

"If actual sales or bona fide bid and asked prices are not available, then, in the case of corporate or other bonds, the value is to be arrived at by giving consideration to the soundness of the security, the interest yield, the date of maturity, and other relevant factors, and, in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity and all other relevant factors having a bearing upon the value of the stock. Among such other relevant factors to be considered are the values of securities of corporations engaged in the same or a similar line of business which are listed on an exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. \* \* \*"

The provisions of Regulations 108 (Gift Tax, sec. 86.19) were essentially similar.[6]

---

6. "Valuation of property.—(a) *General.*—The statute provides that if the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. The value of the property is the price at which such property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell. The value of a particular kind of property is not to be determined by a forced sale price. Such value is to be determined by ascertaining as a basis the fair market value at the time of the gift of each unit of the property. For example, in the case of shares of stock or bonds, such unit of property is a share or a bond. All relevant facts and ele-

### The Decisions

The term "fair market value" has been a troublesome one for the courts in cases where there is no practical possibility of a sale of the property on the open market. "An actual sale in an open market is out of the question. A feat of imagination has to be performed." Romer, L. J. in In re Paulin, [1935] 1 K.B. 2663. But "the absence of market price is no barrier to valuation." Guggenheim v. Rasquin, 1941, 312 U.S. 254, 258, 61 S.Ct. 507, 509, 85 L.Ed. 813. See also Kline v. Commissioner, 3 Cir., 130 F.2d 742, 744; Helvering v. Walbridge, 2 Cir., 70 F.2d 683, 684.

The Supreme Court has not yet considered any estate or gift tax case involving the valuation of stock subject to a restrictive agreement. In Helvering v. Salvage, 1936, 297 U.S. 106, 56 S.Ct. 375, 377, 80 L.Ed. 511, an income tax case, it was held that the "fair market value" of shares for determining the cost basis for estimating capital gain could not exceed the price at which they had to be sold under an outstanding option.

In the 1930's two estate tax cases in the Second Circuit, Wilson v. Bowers, 57 F.2d 682, and Lomb v. Sugden, 82 F.2d 166, established the rule in that circuit at least, that the existence at date of death of a valid enforceable option, exercise of which would compel the executor to sell the shares at the stipulated price, fixes their value for federal estate tax purposes at the option price. This rule was held applicable even though the option was not exercised and despite the fact that the fair market value at date of death of shares not subject to such a restriction might exceed the agreement price. Lomb v. Sugden cited Helvering v. Salvage but was decided before the gift tax case of Guggenheim v. Rasquin, 1941, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813, discussed below. Commissioner of Internal Revenue v. Bensel, 3 Cir., 100 F. 2d 639, limited the value to the option price in a case where the restriction was imposed in "settlement of a business problem" by persons "dealing at arm's length".

These cases stressed the *sale* value of the stock, giving little if any weight to the *retention* value, i. e. the right of the legatee, derived from the decedent at his death, to hold the stock subject to the restrictive agreement and to collect dividends thereon. But the retention value is important in both of the cases at bar, the estate tax case as well as the gift tax case, since the certificates to be valued were covered by deeds of trust, executed pursuant to the provisions of the depository agreement, which permitted the successive beneficiaries to hold the beneficial interest in the certificates and to continue to receive dividends thereon, despite the death of the respective grantors or of the original beneficiaries, until the termination of the trusts, without the necessity of selling at the formula price fixed by the agreement.

In Worcester County Trust Co. v. Commissioner, 1 Cir., 134 F.2d 578, the restriction was against sale during life, but did not apply to transfers to legatees or next of kin in distribution of a decedent stockholder's estate. In that respect it was similar in effect though not in form to the agreement in the case at bar, which permitted the creation of trusts to last during the term of the agreement. The First Circuit held that

---

ments of value as of the time of the gift should be considered.

\* \* \* \* \*

"(c) *Stocks and bonds.*—The value at the date of the gift in the case of stocks and bonds, within the meaning of the statute, is the fair market value per share or bond on such date.

\* \* \* \* \*

"If actual sales or bona fide bid and asked prices are not available, then, in the case of corporate or other bonds,

the value is to be arrived at by giving consideration to the soundness of the security, the interest yield, the date of maturity, and other relevant factors, and, in the case of shares of stock, upon the basis of the company's net worth, earning power, dividend-paying capacity, and all other relevant factors having a bearing upon the value of the stock. Complete financial and other data upon which the donor bases his valuation should be submitted with the return."

the retention value as well as the sale value should be considered; that the restriction did not impose a ceiling on value for estate tax purposes; but that since the restriction did affect the market value of the stock it should be "considered as one of the 'relevant factors having a bearing' on that question." 134 F.2d at page 582.

In gift tax cases, where the owner may continue to hold his shares if he wishes to do so, the courts have emphasized the value of the right of retention, and have held that such a restriction on the right to transfer does not limit the valuation, but is a factor which should be considered along with other elements affecting value. Kline v. Commissioner, 3 Cir., 130 F.2d 742, 743; Krauss v. U. S., 5 Cir., 140 F.2d 510; Commissioner of Internal Revenue v. McCann, 2 Cir., 146 F.2d 385; Spitzer v. Commissioner, 8 Cir., 153 F.2d 967, 5 A.L.R.2d 1114; Raymond J. Moore, 3 T.C. 1205; O'Neal, Stock Transfer Restrictions, 65 Harv. L.R. 773, 813.

These cases are in line with Guggenheim v. Rasquin, 1941, 312 U.S. 254, 61 S.Ct. 507, 85 L.Ed. 813, where the Supreme Court held that the value for gift tax purposes of a single premium life insurance policy was the cost of acquiring a similar policy on the date of gift. Taxpayer argued that the amount of the gift was limited to the cash surrender value, but the Supreme Court said:

"* * * Surrender of a policy represents only one of the rights of the insured or beneficiary. * * * All of the economic benefits of a policy must be taken into consideration in determining its value for gift-tax purposes. To single out one and to disregard the others is in effect to substitute a different property interest for the one which was the subject of the gift. * * * Cost is

cogent evidence of value. And here it is the only suggested criterion which reflects the value to the owner of the entire bundle of rights in a single-premium policy—the right to retain it as well as the right to surrender it. * * * " 312 U.S. at pages 257–258, 61 S.Ct. at page 509.

■ The Wilson, Lomb and Bensel cases are still the law of the Second and Third Circuits in *estate* tax cases, May v. McGowan, 2 Cir., 194 F.2d 396, Commissioner of Internal Revenue v. Childs' Estate, 3 Cir., 147 F.2d 368, although, as we have seen, a different rule has been applied in those circuits in *gift* tax cases, Commissioner of Internal Revenue v. McCann, 2 Cir., 146 F.2d 385, Kline v. Commissioner, 3 Cir., 130 F.2d 742, 743. But even in estate tax cases their authority has been weakened by the gift tax decisions, e. g. Guggenheim v. Rasquin, Kline v. Commissioner and the other cases cited above, and by later estate tax cases, e. g. Worcester County Trust Co. v. Commissioner, 1 Cir., supra; James H. Matthews, 3 T.C. 525; Claire Giannini Hoffman, 2 T.C. 1160, 1176–1180, affirmed on other grounds, Giannini v. Commissioner, 9 Cir., 148 F.2d 285, certiorari denied 326 U.S. 730, 66 S.Ct. 38, 90 L.Ed. 434, which indicate that the rule should be limited to situations in which the specified transfer price is applicable both to transfer during the holder's lifetime and to transfer on his death. The present and proper rule is that the specified price is not controlling for estate tax purposes unless the restrictive provision (1) prevents transfer of the shares during the holder's life at a figure higher than the specified price, and (2) grants an option to purchase, or requires a transfer, at that price on the shareholder's death.[7] As we have seen, the agreement in our case did not require that Dr. Goldberg's shares be sold upon his death, but permitted him to

7. A third qualification to the rule, recognized in Wilson v. Bowers and Commissioner of Internal Revenue v. Bensel, that it must be shown that the option price when originally fixed represented full and adequate consideration in money or money's worth, and was neither a substitute for testamentary disposition nor a tax avoidance device, Armstrong's Estate v. Commissioner, 7 Cir., 146 F.2d 457, Claire Giannini Hoffman, supra, is met in the case at bar.

place them in a trust which may continue for thirty-five years.[8]

■ The restrictive agreement, however, in both estate and gift tax cases, should be considered as one of the relevant factors having a bearing on the question of value, usually depressing but possibly enhancing the value of the shares. Cf. Worcester County Trust Co. v. Commissioner (1 Cir.) supra; Commissioner of Internal Revenue v. McCann (2 Cir.) supra; Kline v. Commissioner (3 Cir.) supra.

In the light of all these authorities, we must consider the evidence and the contentions of the respective parties in the two cases at bar.

The government contends that the agreement of November 1, 1946, should be disregarded in fixing value. But Judge Brune's testimony makes it clear that the agreement was entered into for business reasons and was not a tax avoidance device. I have found that the major factor in fixing the formula price was the uncertainty whether Abraham Krieger or Eliasberg would be the ultimate purchaser, with the other and his family as the ultimate sellers; and that each of them wished to fix a price which would be fair to him and his family in either situation, and which would not be so great as to be prohibitive to the purchaser as a practical matter.

### The Expert Testimony

Taxpayers called Henry C. Evans, Sewall S. Watts, Jr., and Joseph J. Turner, partners, respectively, in the Baltimore investment banking firms of Stein Brothers & Boyce, Baker Watts & Co., and Alexander Brown & Sons, as well as Louis Eliasberg. The government called Fred W. Calhoun, of the Court Defense Section of the Internal Revenue Service, and Bernard J. Nees, a member of the Washington firm of Johnston Lemon & Co.

All of the witnesses began by choosing from five to sixteen companies engaged in the brewing business whose common stocks are listed on some stock exchange or actively traded over the counter. Various criteria were used by the several witnesses in selecting the companies; generally speaking, taxpayers' witnesses chose companies roughly comparable to Gunther in the years before 1947, while the government's witnesses chose a number of larger companies as well, because of the fact that Gunther had matured plans in 1946 to modernize its plant and make a drive for additional business, which bore handsome fruit in 1947.

The brewery had been purchased in 1931 for $200,000, a very low figure compared to the cost of the plant of most brewing companies, but Gunther must have spent some money on plant improvements in the 1930's and had set aside $1,250,000 during the war years for modernization. The expenditure of this reserve would bring the book value of the plant more in line with other breweries of comparable capacity, since its primary purpose was to preserve the competitive position of Gunther and not to expand its capacity. I find that all of the witnesses made their selections of companies in good faith, and that all of the ratios they developed from their respective computations are entitled to some weight.

All of the witnesses determined a market price/book value ratio for the selected companies, and applied that ratio to Gunther's December, 1946, book value. All of the witnesses determined a market price/1946 earnings ratio, and applied it to Gunther. Four of the witnesses also used market price/5-year (1942–1946) earnings, and two used market price/10-year earnings. All but Evans also used a market price/dividend ratio. Applying these ratios to Gunther's figures produced the following results:

8. For full discussions of the problem, see O'Neal, Stock Transfer Restrictions, 65 Harv.L.R. 773, 809, et seq. (1952); Molloy, Restraints on Alienation and the I.R.C., 7 Tax L.R. 439, 452, et seq. (1952); Cohen, Agreements for Purchase of Stock, 5 N.Y.U.Inst.Fed.Tax (1947), p. 54; Pavensteat, Restrictive Stock Agreements, 51 Mich.L.R. 1 (1952); Ness, Federal Estate Tax Consequences of Agreements and Options to Purchase Stock on Death, 49 Col.L.R. 796.

Table B.

Value of One Share of Gunther Stock in December, 1946, Based on the Ratios Developed from Selected Brewery Stock Listed on Recognized Exchanges.

| Witness | Market/Book | Market/1946 Earnings | Market/5 yr. Earnings | Market/10 yr. Earnings | Dividend Yield | Average of Factors Used |
|---|---|---|---|---|---|---|
| Eliasberg (T) | $2,029 | $2,533 | $2,962 | | $2,894 | $2,604 |
| Evans (T) | 2,271 | 2,484 | | | | 2,378 |
| Watts (T) | 2,349 | 2,946 | 3,039 | | 2,701 | 2,759 |
| Turner (T) | 2,135 | 2,623 | 3,010 | | 3,106 | 2,888 |
| Calhoun (G) | 2,563 | 3,227 | 3,335 | $3,564 | 3,392 | Not Calculated |
| Nees (G) | 2,556 | 3,227 | | 3,545 | 3,392 | Not Calculated |

After reaching a theoretical value for shares of Gunther stock based upon the average of the factors used, each witness for taxpayers then placed a value on voting trust certificates for such shares by discounting the stock value by 20% or 25% because of low marketability and the high price per share. The resulting figures are shown in Table C, infra.

They then made an additional deduction or discount because of the restrictions in the depository agreement. Eliasberg's additional discount was 40%, resulting in a December, 1946, value of $1,250.32, and a June, 1947, value of $1,332.82, which were less than the formula prices. When his attention was called to this fact, he increased each figure to the applicable formula price, namely $1,305.30 and $1,509.64. Evans valued the depository receipts at the formula price for each date. Watts valued them at $1,500 as of December 31, 1946, which was substantially the formula price applicable in 1947.

Turner took a different approach. He agreed that the sale value was the formula price; but he recognized that the retention value was greater. He therefore split the difference between the formula price and his valuation of the voting trust certificates on each date, and valued the depository receipts at $1,830 per share on December 10, 1946, and at $1,833 per share on June 23, 1947. Although the book value and earnings of Gunther stock went up steadily from 1945 through 1947, the market was placing a lower value on brewery earnings in June, 1947, than it had in December, 1946.

The government witnesses made no deduction for high price, low marketability or the provisions of the depository agreement, although they said they considered those factors along with others in reaching their final figures. Calhoun found a December, 1946, value of $3,550, larger than that reached by applying any of his ratios. Nees found a December, 1946, value of $3,200, reached by giving greater weight to earnings and dividend yield than to book value. Both government witnesses stressed the high quality of the management and the stable dividend record. On the other hand, Evans had not calculated a figure based on dividend yield, because, he said, rich men, who alone could be interested in such a security, did not want dividends because of tax reasons, but wanted capital gains, and preferred companies which ploughed back their earnings.

A summary of the witnesses' conclusions is as follows:

Table C

| Witness | Value Voting Trust Cert. | Value Dep. Receipt Dec., 1946 | Value Dep. Receipt June, 1947 |
|---|---|---|---|
| Eliasberg (T) | $1,918 | $1,250 | $1,332 |
| Evans (T) | 1,783 | 1,305 | 1,505 |
| Watts (T) | 2,150 | 1,500 | 1,500 |
| Turner (T) | 2,310 | 1,830 | 1,833 |
| Calhoun (G) | —— | 3,550 | 3,500 |
| Nees (G) | —— | 3,200 | 3,200 |

Eliasberg gave a list of valuation factors which he testified he had considered. They were: (1) earning power; (2) dividends paid; (3) book value; (4) the "stable" or the hazardous and speculative nature of the business; (5) the adequacy of reserves for depreciation; (6) the size of the holding; (7) surplus available for dividends; (8) sales of the same stock; (9) restrictions, if any, on the sale of the stock; (10) ability of the management; (11) the company's reputation and position in the industry; (12) the company's distribution and method; (13) the company's opportunity for promoting new product; (14) the company's

competitive position and the possibility of more serious future competition; (15) the condition of the company's plants and equipment; (16) the volume of business; (17) whether the business was passing at valuation date through a period of prosperity or depression; (18) the various ratios on the balance sheet and earnings statement; (19) the effect of tariffs, taxes, transportation regulations and other legal restraints and restrictions; and (20) the length of time the company has been in business.

## Conclusions

I agree that all of these factors should be considered. When the testimony of all the witnesses is reviewed, it is clear that Eliasberg, Evans and Watts stressed the sale value as fixed by the agreement to the exclusion of all factors which gave the shares a retention value in excess of the sale value. On the other hand, the government witnesses, although stating they had considered the unfavorable factors, gave them no apparent weight. Turner alone, it seems to me, adopted the proper approach to the problem by giving weight to both the sale value and the retention value.

There is merit to the government's contention that all of taxpayer's witnesses, including Turner, were inconsistent in making allowances for high price per share and low marketability, and then making further allowances on the theory that the shares were not marketable at all under the terms of the depository agreement. But the government and its witnesses are wrong in practically ignoring both the depository agreement and the factors which made the agreement necessary or desirable for the Krieger-Eliasberg shareholders. However good the management was, and I find that it was very good indeed, the sword of Damocles might fall if any one of those shareholders sold a single share to the Hoffberger interests. True, it would not fall until the expiration of the voting trust, but that would always be less than ten years, and the threat of control passing into the hands of an aggressive competitor was one which undoubtedly depressed the value of the shares in the voting trust, and caused all of the holders of the voting trust certificates to prefer the cramped shelter of the depository agreement. However, the agreement permitted the shareholders to enjoy liberal dividends and to contemplate the future enjoyment of dividends by themselves and by the beneficiaries of the trusts which they hastened to create, for a period of thirty-five years, subject to the hazards of death, loss of management skill, and prohibition, to which other brewery investments are subject. In short, the agreement assured the continuance of the existing management and enhanced the retention value of the shares. This is particularly true in the case of Abraham Krieger, who was one of the purchasers as well as a possible seller under the agreement.

Both the sale value and the retention value of the stock must be considered. In determining the latter, particular weight must be given to Gunther's earning record over the years, set out above in Table A. The business had been steadily profitable, and in the light of the past record, the five-year (1942–46) average earnings of $250.77 indicate a retention value for the shares in December, 1946, and June, 1947, of about $3,000. Other good brewery stocks were selling around eleven to twelve times their five-year earnings, and Gunther's earnings were increasing rapidly, from $242.53 in 1945 to $385.76 in 1946, to say nothing of the $562.09 in 1947. Earnings are the principal element to be considered in determining retention value.

Lack of marketability must also be considered in determining fair value; and I have considered it by weighing both the retention value and the sale value. The sale value was higher in June, 1947, than in December, 1946, $1,509.64 vs. $1,305.30, and the earnings were running higher, but the market was putting a lower value on brewery earnings in June, 1947, than it had in December, 1946. Considering all of the factors, the expert testimony and the

other evidence, I conclude that the value on December 10, 1946, of the deposit receipt for voting trust certificates of Gunther Brewing Company common stock which Abraham Krieger owned and placed in trust on December 10, 1946, was $2,300 per share, and that the value on June 23, 1947, of the similar certificate which is includable in Dr. Goldberg's gross estate for estate tax purposes was $2,300 per share.

Counsel will prepare a judgment order giving effect to these rulings.